**The STATE of Ohio, Appellee,**

v.

**CLARK, Appellant.**

[Cite as *State v. Clark* (1995), 101 Ohio App.3d 389.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 65805.

Decided Feb. 27, 1995.

390

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Edward M. Walsh,* Assistant Prosecuting Attorney, for appellee.

*C. Randolph Keller,* for appellant.

DONALD C. NUGENT, Judge.

Defendant-appellant, Lamont Clark, timely appeals from a judgment of conviction from the Cuyahoga County Court of Common Pleas stemming from a jury verdict finding him guilty as indicted of the murder of Tanya Banks in violation of R.C. 2903.02.

At appellant's jury trial, Brenda Banks, Tanya's mother, testified first for the state. Banks explained that Tanya and appellant had lived together for approximately one and one-half years prior to her murder. Tanya and appellant had one child together, Damontais, who was approximately two years old. Tanya also had another child, Denver (age four), who lived with her and appellant.

Tanya and appellant lived with Banks for a couple of months and eventually moved into an apartment of their own. However, Banks testified that after moving into their own apartment, Tanya and the children would sometimes stay with her when Tanya and appellant were fighting. Banks testified that Tanya and appellant frequently argued in 1992.

On July 25, 1992, appellant's brother came to Banks's house and told her that Tanya had been shot. Banks proceeded to Huron Road Hospital, where she received the news of Tanya's death.

Dr. Elizabeth K. Balraj, the Cuyahoga County Coroner, testified next. Balraj performed an autopsy on Tanya Banks on July 26, 1992. Balraj testified that Tanya had an entrance gunshot wound on the right side of her upper abdomen and an exit wound on her left lower back. The bullet traveled through soft tissue from front to back, from the right to the left side and in an upward path. The cause of death was a gunshot wound of the abdomen with perforations of the abdominal viscera, including the intestines and kidney, and hemoperitoneum or internal hemorrhaging in the abdominal cavity. Balraj ruled Tanya's death a homicide. Tanya was eleven weeks pregnant.

Patrolman Steven Zedella, an officer of the Cleveland Police Department, Sixth District, was working the second shift, from 3:30 p.m. to 11:30 p.m., when he received a radio assignment, at approximately 6:00 to 6:30 p.m., to respond to Huron Road Hospital for a victim of a self-inflicted gunshot wound. Officer Zedella testified that while proceeding to the hospital, he received a second call that there was an irate male at the hospital.

Once at the hospital, Officer Zedella was directed to appellant, who, it was learned, had brought the victim to the hospital with another female, later identified as Nicki Hicks. At this point, Officer Zedella was told that the victim was in stable condition.

Officer Zedella spoke with appellant at the hospital. Appellant told Officer Zedella that he and Tanya had been fighting earlier in the day. Later, appellant was in the bathroom, sitting on the toilet, when Tanya approached him with a gun. An argument ensued, and appellant took the pistol from her. Tanya sat down on the edge of the bathtub and began talking with appellant. Next, Tanya attempted to take the pistol from appellant, and the gun went off. Appellant told Officer Zedella that Tanya had grabbed the gun by the barrel when it went off. After speaking with appellant, Officer Zedella placed him under arrest and read him his constitutional rights, which appellant stated he understood. Appellant then told Officer Zedella that the gun was back at the apartment.

Officer Zedella took appellant to the apartment to confiscate the weapon. Zedella's partner stayed with appellant in the kitchen while Zedella proceeded to the bathroom to locate the weapon. Zedella failed to locate the weapon where appellant had told him it was located. Subsequently, Nicki Hicks told him that she had moved the weapon and placed it on top of the headboard of appellant's bed. Zedella then retrieved a .9mm handgun which had one live round in the chamber and six rounds in the clip.

Officer Zedella further explained that Nicki Hicks was at the hospital and knew the officers were going to return to the apartment to retrieve the weapon but remained silent as to the weapon's whereabouts. Hicks remained uncooperative at the hospital and refused to give the officers any information.

Once inside the apartment, Officer Zedella noticed a large lamp which had been knocked over, dirt on the floor and a plant near the front door which had also been knocked over.

Zedella and appellant went into the bathroom, where appellant attempted to reenact the incident. Appellant told Zedella that Tanya was to his left and sitting on the bathtub when she attempted to reach for the gun and it went off. Zedella observed a bullet hole in the shower approximately six feet off the ground. Zedella also looked for, but was unable to find, a spent bullet casing.

As Zedella and appellant were leaving the apartment to proceed to police headquarters, another male came into the apartment. Appellant took out a wad of money and gave it to the male, claiming it was for rent. At the Sixth District police station, Zedella learned that the victim had died. He then went back to the apartment to get photographs but was unable to get inside.

On cross-examination, Zedella stated that appellant told him he had purchased the .9mm handgun from a friend because his apartment had been broken into approximately one month earlier.

Detective Mike O'Malley, a homicide detective with the Cleveland Police Department, also conducted an investigation into the shooting. Det. O'Malley

received the assignment at approximately 9:15 p.m. on the night of the shooting. He met with a Lieutenant Emory, Officer Zedella, Nicki Hicks and appellant.

After being advised of his constitutional rights, which he stated he understood, appellant made a second oral statement. Appellant told Det. O'Malley that on the evening of the shooting, he was in the bedroom when he got up and walked into the bathroom. Tanya then entered the bathroom with the gun in her hand. Appellant told Tanya a couple of times to put the gun away. Tanya gave the gun to appellant but attempted to take it back. When she reached for the gun, it went off. Appellant then took Tanya to the hospital.

Det. O'Malley testified that appellant's mother and Nicki Hicks were also at Sixth District headquarters. Det. O'Malley stated that after being informed of his identity, Hicks became very agitated and began sucking her thumb. Appellant's mother and Hicks later asked to see appellant, but after being informed that there was no visitation, they stormed out of the Sixth District headquarters.

On July 28, O'Malley executed a search warrant for appellant's apartment to recover any pellets or shell casings and to photograph the scene. O'Malley had photographs taken of the apartment, including the bathroom, and also took measurements of the bathroom. O'Malley also recovered a pellet from behind the shower stall.

Emory Carroll, a salesman at the Stonewall Pistol Range in Broadview Heights, Ohio, sold the instant .9mm revolver on July 22, 1992 to Jesse Ware, whom he knew to be a regular customer at the pistol range. Carroll was able to identify the handgun by matching the registration number listed on the sales receipt and ATF form to the number found on the gun. On July 22, Ware purchased the handgun and some ammunition, and he and others whom he was with practiced at the shooting range.

Raymell Taylor also testified at trial. Taylor was with Ware when Ware purchased the handgun at appellant's request. According to Taylor, appellant wanted to buy the gun but did not have any identification, so Ware bought the gun for appellant. After leaving the shooting range, appellant left with the gun.

Sharon Rosenburg, a forensics examiner in the coroner's office, Trace Evidence Department, also testified for the state. Rosenburg testified that a gunshot residue test performed on the victim's hands revealed no reaction for components of ammunition. Further, a trace metal detection test on the victim's hands revealed no reaction except where there was blood. In short, Rosenburg had no evidence to indicate that the victim had handled or fired a weapon.

Rosenburg conducted further examinations on the victim's clothing. She found bullet holes or defects which corresponded with the injuries on the victim's body. Rosenburg and Det. O'Malley ran muzzle-to-target distance tests on the instant

.9mm revolver and determined that the minimum muzzle-to-target distance where no fouling or stippling would be detected was thirty to thirty-six inches. Rosenburg also performed a Greis test on the victim's clothing and was unable to detect the presence of fouling or stippling. Therefore, Rosenburg concluded that the minimum muzzle-to-target distance at the time the fatal shot was fired was thirty to thirty-six inches. Rosenburg provided her findings to James Wentzel.

On cross-examination, Rosenburg acknowledged that while she found no evidence that the victim had handled a gun, the instant handgun had a plastic or rubberized grip, and Rosenburg would not expect a reaction from the trace metal detection test in question had the victim touched the grip of the gun.

James T. Wentzel testified next for the state. Wentzel is a forensic photographer and crime scene reconstructionist at the Cuyahoga County Coroner's Office. Wentzel used an IBM 286 computer and AutoCAD software to reconstruct the instant crime scene. Wentzel explained that AutoCAD is a brand name for computer-assisted drafting software which maintains sixty percent of the market share. AutoCAD is used by automobile and aircraft manufacturers, and it is also used to construct buildings and bridges. In essence, Wentzel explained, AutoCAD is an electronic drafting table.

Using the dimensions provided by Det. O'Malley, Wentzel used the AutoCAD software to reconstruct the bathroom in question. Wentzel explained that in using the AutoCAD software, once a drawing is made, a user can rotate the drawing and look at it from different positions without having to redraft the entire drawing, as would be the case if using an ordinary drafting table.

For purposes of reconstruction, Wentzel assumed the bullet went in a straight line from muzzle to entrance and exit wounds and through to the hole in the bathroom wall. Wentzel explained that he had obtained the coroner's report, which noted that the bullet passed only through soft tissue in the victim and that there would be no deflection from a bone.

In reconstructing the crime scene, Wentzel arranged the victim so that the entrance and exit wounds lined up with the hole in the bathroom wall. He explained that the bullet hole in the wall is the end point of the line and that the victim would have to be somewhere on the line. The room's dimensions, however, placed physical limitations on the location of the victim at the time of the shooting. Also taken into consideration was the victim's physical dimensions, such as height and weight. Finally, Wentzel used thirty inches as the minimum muzzle-to-target distance as taken from Rosenburg's test results.

At this point in his testimony, Wentzel used numerous poster-sized exhibits, which were blown-up printouts of the computer-generated drawings of the bathroom, to explain to the jury the results and conclusions of his report.

Wentzel acknowledged that it was impossible to place the victim and the assailant in their exact positions at the time of the fatal shooting. Instead, Wentzel was mostly concerned with the location of the entrance and exit wounds, which represented the victim's location. Wentzel then proceeded to describe with a series of arcs and lines the areas in the bathroom where the gun and the entrance and exit wounds (representing the victim) had to be in relation to one another and in relation to the bullet hole, which represented the end point of the line upon which the bullet traveled. Over short intervals, Wentzel explained, the path of the bullet could be represented as a straight line, with the muzzle of the gun and the bullet hole above the bathtub being endpoints of this line and the entrance and exit wounds being points somewhere along this line. The path of the bullet was also limited by the dimensions of the bathroom and the physical location of fixtures such as the toilet and the sink.

The victim's physical posture, such as whether she leaned forward or backward, was also taken into consideration. Wentzel, therefore, drafted several reconstructions for the time of the fatal shooting ranging from where the victim was standing upright to where she was leaning forward. Wentzel noted that if the victim were standing upright, the fatal shot would have had to have been fired from beyond the bathroom wall in order to maintain a straight bullet path. He further noted that the more the victim bent over, the closer she would have had to be to the wall in the bathtub and the lower the gun would have had to be to the floor at the time of firing in order to maintain a straight bullet path from the muzzle, through the body, to the wall.

Wentzel explained:

"On Page 9, also I explored if the victim were sitting on the edge of the tub. What happens if the victim, let me grab my model. If the victim were sitting on the edge of the tub, they become so close to the hole in the wall above the bathtub that the victim would really have to be bent over in order to get that lineup with the point. By bending that over and keeping the muzzle, the entrance distance always 30 inches, what happens if the victim is sitting on the edge of the tub, the muzzle of the gun would have to be three and a half inches below the level of the floor. The distance from the exit wound to the bullet hole is 40.8 inches.

"Under the comments, the victim was not sitting when shot because the gun could not have been fired from below the floor."

Finally, Wentzel explained to the jury his conclusions:

"And then the final one is the Conclusions. And that is Page 3. Conclusions and Most Likely Scenario. I wrote it is possible to draw several conclusions from the geometric reconstruction of the bathroom. The first is that the victim was

not standing erect when shot because the gun would have to have been fired from beyond the bathroom. The second is that the victim was not seated on the edge of the bathtub when shot because the gun would have to have been fired from below the bathroom floor. Third, at angles of greater than 15 degrees the victim is generally on or in the bathtub which would change the height of the exit and entrance wound, further alter the remaining geometry, therefore, the victim was not in or on the tub. Fourth, the victim could not be holding the muzzle of the gun. If the victim was bent, this is for example, if the victim was bent at 15 degrees, the muzzle would be 26.7 inches above the floor. In order to reach the gun the victim would have to bend more than 15 degrees. By doing that, once she bends more than 15 degrees, the muzzle of the gun is going to get lower, and based on this geometry there is no possible way to reach the gun.

"Every time you bend more your geometry changes, and the gun gets lower. And so, in order to reach the gun, the victim would have to bend more than 15 degrees, thereby lowering the gun and moving all the arc closer to the bathtub. While it is possible the victim was moving toward the gun, she was not in direct contact with the gun at the time of the fatal shooting.

"Due to the physical limitations of space in the bathroom, the most likely scenario is for the gun to have been fired in the vicinity of the toilet with the muzzle height of approximately 26.7 to 31.4 inches with the victim bending between 10 and 15 degrees."

Wentzel also testified that if the victim's arm were twenty-eight inches in length, she could not reach the muzzle of the gun if the muzzle were thirty inches or more away from her. Due to the geometrics, if the victim bent to reach the gun, the gun would have to move below the floor to maintain a straight line.

Finally, Det. Daniel Rowley, a firearms examiner with the Cleveland Police Department, Scientific Identification Unit, testified to having examined the gun in question. Rowley stated that the weapon could not be fired without pulling the trigger due to the numerous internal safety mechanisms. Rowley also stated that a spent shell casing would be ejected upward and to the right approximately four feet after the gun had been fired. Additionally, after having examined a bullet shot from the gun into a nine-hundred-gallon bullet recovery tank with the bullet recovered from the wall in appellant's apartment, Rowley opined that the bullet recovered from the wall was fired from the handgun in question.

Nicki Hicks was the first witness to testify on behalf of the appellant. Hicks, a seventeen-year-old at the time of the shooting, testified that she had been really good friends with Tanya Banks for the last four or five years. Hicks frequently spent the night at Tanya and appellant's apartment and had spent almost an entire week at the apartment before the shooting. Hicks stated that appellant

treated Tanya and her children well. According to Hicks, appellant and Tanya were happy about Tanya's pregnancy and planned on getting married.

On the day of the shooting, Hicks arrived at the apartment at approximately 9:00 a.m. Tanya cooked breakfast while the kids played and appellant lay on the couch. Hicks added that the house was clean and that Tanya always kept a clean house. At approximately 1:00 p.m., appellant left the apartment and did not return until 3:00 or 4:00 p.m.

Later in the evening, Tanya, appellant and Hicks were in the living room watching television when Tanya reached behind her and retrieved a gun off a window ledge. According to Hicks, Tanya and appellant joked around while Tanya played with the gun. On several occasions, Tanya pointed the gun at appellant and said, "Bang, bang." Hicks also claimed that she saw Tanya cock the gun before going into the bathroom. At some point, appellant left the room, went into the kitchen and then went into the bathroom. Several seconds later, Tanya got up and followed appellant into the bathroom.

For the next "two to three minutes," Hicks heard Tanya and appellant talking and laughing in the bathroom. According to Hicks, there were no angry words or raised voices coming from the bathroom. Hicks next testified that she heard appellant tell Tanya to "put [the] gun up" and say, "Girl, what are you doing with that gun?" The next thing she heard was the gun going off. Hicks then jumped up and ran to the bathroom. Although she did not go inside, the door was cracked, and she saw Tanya crawling out.

Hicks testified she heard Tanya say, "Oh, God, Lamont, look what I done." Appellant replied, "Tanya, get up, stop playing, stop playing. Tanya, you play too much." However, after appellant saw blood, he yelled, "Oh, God," and rushed out of the bathroom while pulling up his pants. At this point, Hicks began screaming and awoke appellant's brother, Tony. Appellant and Tony then rushed Tanya to the hospital.

Hicks stayed with Tanya's children before dropping them off at a neighbor's and proceeding to the hospital with Tanya's mother. Finally, Hicks stated that when she spoke with the police, she was very upset.

On cross-examination, Hicks stated she did not know what happened to the shell casing. Hicks also claimed to have told the police officers where the gun was before they left for the hospital. Additionally, Hicks claimed to have seen the gun at appellant's apartment at least one week prior to the shooting. Finally, Hicks claimed that appellant gave her the rent money after he was arrested and denied that appellant's brother, Tony, ever came back to the apartment after the shooting.

Emma Wright testified next for appellant. Wright was Tanya's and appellant's next-door neighbor for approximately two years. Wright stated that Tanya and appellant always appeared to get along. On cross-examination, however, Wright stated that Tanya had left appellant for approximately six months.

On July 25, Wright was sitting on her front porch when appellant came rushing out of their apartment holding Tanya with a bloody towel under her stomach. Appellant was telling Tanya, "Hold on, baby, hold on, baby." Tanya also cried out, "You ain't did nothing. He ain't did nothing." Wright claimed she asked Tanya what was wrong, to which Tanya replied, "It ain't his fault."

Jesse Ware also testified for appellant. Ware insisted that he, Chris Hunter, appellant and a man named Raymell went to the Stonewall Pistol Range together, where he bought the gun at Chris Hunter's request. Ware claimed that appellant never asked him to buy the gun. On cross-examination, however, Ware acknowledged that he lied about former convictions on the ATF form to purchase the gun. In any event, Ware stated that on the way back from the gun range, Chris Hunter traded the .9mm gun with appellant for another .9mm handgun which appellant had previously loaned to Hunter.

Finally, Monica Hall testified for appellant. Hall, who is dating Tanya's father, stated she was best friends with Tanya. Hall stated that appellant was very happy about Tanya being pregnant. Hall also stated that Tanya and appellant were going to get married but were waiting until Tanya's mother and father came home from some undisclosed location.

Based on the foregoing, the jury found appellant guilty of murder in violation of R.C. 2903.02 and further found appellant guilty on the gun specification. The trial court sentenced appellant to a term of imprisonment of fifteen years to life, consecutive with three years on the gun specification.

Appellant raises the following assignment of error for our review:

"I. The conviction of defendant-appellant for the crime of murder in violation of R.C. 2903.02(B) is against the manifest weight of the evidence and based on insufficient evidence.

"II. The trial court abused its discretion when it overruled defendant-appellant's motion for acquittal pursuant to Crim.R. 29.

"III. The trial court abused its discretion when it overruled defendant-appellant's motion to exclude the testimony of James T. Wentzel.

"IV. The trial court abused its discretion when it failed to give the jury an instruction on the lesser included offense of involuntary manslaughter.

"V. The defendant-appellant was denied effective assistance of counsel when trial counsel failed to request a jury instruction on the lesser included offense of involuntary manslaughter.

"VI. The defendant-appellant was unduly prejudiced by the latitude of direct and cross-examination afforded the prosecution which resulted in the denial of appellant's Sixth Amendment right to a fair trial.

"VII. The trial court abused its discretion when it overruled defendant-appellant's motion for mistrial."

I

Appellant's first and second assignments of error contest the sufficiency and the weight of the evidence.

Crim.R. 29 provides:

"The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."

The standard of review with regard to the sufficiency of evidence is set forth in *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, paragraph one of the syllabus:

"Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." See, also, *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394, 399; *State v. Davis* (1988), 49 Ohio App.3d 109, 550 N.E.2d 966.

*Bridgeman* must be interpreted in light of the sufficiency test as outlined in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, in which the Ohio Supreme Court held:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"

■ In order to sustain appellant's conviction for murder, this court must view the evidence in a light most favorable to the prosecution and find that sufficient evidence on each essential element of the crime exists to prove appellant guilty beyond a reasonable doubt. R.C. 2903.02 provides that "[n]o person shall purposely cause the death of another." R.C. 2901.22(A) further provides:

"A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

■ The thrust of appellant's argument is that there exists no evidence that he intended to kill Tanya Banks. All along, appellant has maintained that her death was accidental. However, intent to commit an offense is not something easily proven by direct evidence. It must ordinarily be proven by reference to the surrounding facts and circumstances. *State v. Huffman* (1936), 131 Ohio St. 27, 5 O.O. 325, 1 N.E.2d 313; *State v. Flowers* (1984), 16 Ohio App.3d 313, 16 OBR 344, 475 N.E.2d 790; *State v. Balcarcel* (Mar. 17, 1994), Cuyahoga App. No. 65941, unreported, at 12, 1994 WL 86193. It is further well settled that a defendant may be convicted solely on the basis of circumstantial evidence. *Jenks, supra*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof."); *State v. Nicely* (1988), 39 Ohio St.3d 147, 529 N.E.2d 1236, paragraph one of the syllabus ("In the absence of a human body, a confession, or other direct evidence of death, circumstantial evidence alone may be sufficient to support a conviction for murder.") Thus, a jury may find an intention to kill where the natural and probable consequence of a defendant's act is to produce death, and the jury may conclude from all of the surrounding circumstances that a defendant had a specific intention to kill. *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E.2d 517; *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096; *State v. Edwards* (1985), 26 Ohio App.3d 199, 26 OBR 420, 499 N.E.2d 352.

■ In the present case, we conclude that sufficient direct and circumstantial evidence exists to support a verdict that appellant intentionally killed Tanya Banks. First, Tanya's mother, Brenda Banks, testified that Tanya and appellant frequently fought and that Tanya and her children stayed with her when the two fought.

Next, appellant's inconsistent versions of the shooting refute his claim that it was accidental and provide further support for his consciousness of guilt. Appel-

lant first told Officer Zedella that he and Tanya had been fighting earlier in the day and that, later, Tanya approached him with the .9mm handgun as he was using the toilet. An argument ensued. Appellant took away the gun. Tanya then sat on the edge of the bathtub and began talking with appellant. Next, for some unexplained reason, Tanya grabbed the gun by the barrel, and the fatal shot was fired. Later, appellant's version of the events changed. Appellant told Det. O'Malley that he was in the bedroom when he got up and walked into the bathroom. Appellant did not mention that he and Tanya had been arguing. Appellant said that Tanya then entered the bathroom with the gun in her hand. This time, appellant said he told Tanya a couple of times to put the gun away. Tanya then gave the gun to appellant but attempted to take it back, and the gun went off.

Further evidence that the handgun was removed from the bathroom and placed out of the way on appellant's bedpost and the fact that no shell casing was ever found in the bathroom provide additional support that the shooting was no accident. Moreover, although Tanya was shot in the abdomen, there was no evidence of blood spots or smears at the crime scene despite Officer Zedella and appellant having revisited the crime scene soon after the shooting. Thus, evidence tending to show that a conscious effort was made to clean up the scene refutes the claim that the shooting was accidental and that appellant, Nicki Hicks and others involved were frantic after the shooting.

Finally, the forensic evidence adduced at trial tends to disprove appellant's claim that the shooting was accidental and provide additional evidence of appellant's intent to kill. Sharon Rosenburg, a forensic examiner, testified that there was no evidence to support a finding that Tanya had handled or fired a weapon. Further, although the grip of the gun in question was made of a plastic or rubber substance and Rosenburg would not have expected a reaction from the trace metal detection test, the barrel of the gun was metal. This, of course, contradicts appellant's claim that Tanya grabbed the barrel. Perhaps more compelling is Rosenburg's finding that no fouling or stippling was detected on Tanya's clothing. Further testing on the gun revealed that fouling or stippling would be detected if the gun in question had been fired at a muzzle-to-target distance of less than thirty to thirty-six inches. This finding refutes appellant's claim that Tanya grabbed the barrel and the gun went off. Had Tanya actually grabbed the barrel, as appellant claims, the muzzle-to-target distance would necessarily be within thirty inches and fouling or stippling would have likely been detected by Rosenburg.

Appellant's claim that the gun accidentally went off was also refuted by the testimony of Det. Daniel Rowley, a expert firearms examiner. Rowley stated

that the weapon in question could not be fired without pulling the trigger due to the numerous internal safety mechanisms contained on the revolver.

The testimony of James T. Wentzel, a forensic photographer and crime scene reconstructionist, provides additional evidence refuting appellant's claim that the shooting was accidental. Using AutoCAD software to electronically draft or reconstruct the bathroom wherein the shooting occurred, Wentzel concluded that due to the physical limitations of space in the bathroom, the most likely scenario is for the gun to have been fired in the vicinity of the toilet with a muzzle height of approximately 26.7 to 31.4 inches and with the victim bending between ten and fifteen degrees. Further, Wentzel concluded that the victim was not standing erect or seated at the edge of the bathtub when shot. Additionally, the victim could not have been holding the muzzle, as claimed by appellant, since, considering the geometry of the bathroom and the location of the bullet hole in the bathtub panelling, the muzzle of the gun would have been three and one-half inches below the level of the floor.

Finally, the testimony of Dr. Balraj provides sufficient evidence that appellant caused the death of Tanya Banks.

Based on the foregoing, this court concludes that sufficient direct and circumstantial evidence exists to support the jury's verdict that appellant is guilty of murder in violation of R.C. 2903.02. The trial court, therefore, properly overruled appellant's motion for acquittal pursuant to Crim.R. 29.

Having determined that appellant's conviction is supported with sufficient evidence, it remains to be determined whether appellant's conviction is against the manifest weight of the evidence. In Ohio, reversal of a jury verdict as being against the manifest weight of the evidence is an extraordinary remedy which requires the concurrence of all three appeals court judges hearing the case. Section 3(B)(3), Article IV of the Ohio Constitution provides that "no judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." See *State v. Porello* (1941), 138 Ohio St. 239, 20 O.O. 281, 34 N.E.2d 198; *State v. Pope* (1961), 171 Ohio St. 438, 14 O.O.2d 254, 172 N.E.2d 9; and *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294.

In *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, this court aptly set forth the test to be utilized by an appellate court when reviewing a claim that a conviction is against the manifest weight of the evidence. The *Martin* court stated as follows:

"There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader. The court, reviewing the entire

record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. \* \* \* "

■ In determining whether a verdict is against the manifest weight of the evidence, the following factors are guidelines to be taken into account by a reviewing court:

(1) awareness that even a reviewing court is not required to accept as true the incredible;

(2) whether the evidence is uncontradicted;

(3) whether a witness was impeached;

(4) what was not proved;

(5) the certainty of the evidence;

(6) the reliability of the evidence;

(7) the extent to which a witness may have a personal interest to advance or defend by his testimony;

(8) the extent to which the evidence is vague, uncertain, conflicting or fragmentary. *State v. Mattison* (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926; *State v. Wilson* (June 9, 1994), Cuyahoga App. Nos. 64442 and 64443, unreported, at 18–19, 1994 WL 258662.

Appellant first argues the state's witnesses, specifically Officer Zedella and Det. O'Malley, offered contradictory testimony concerning appellant's oral statements of the events surrounding the shooting. However, the jury more reasonably concluded that it was appellant who offered contradictory statements to each officer.

Further, Hicks's testimony fails to lend any credence to appellant's argument that the verdict is against the manifest weight of the evidence. Hicks's testimony contradicts appellant's earlier statements given to the officers. Appellant had told Officer Zedella that he and Tanya had been arguing earlier in the day. Appellant had also told Det. O'Malley that he left the bedroom and went directly into the bathroom. To the contrary, Hicks testified that Tanya retrieved the gun and "joked around" with appellant in the living room. Appellant then got up and walked into the kitchen and then into the bathroom. Seconds later, Tanya followed appellant into the bathroom, carrying the gun. Appellant also claimed to Officer Zedella that he and Tanya argued in the bathroom. Again, to the contrary, Hicks claimed she heard Tanya and appellant talking and laughing. Further, although Hicks claimed that Tanya played with the gun in the living

room then followed appellant into the bathroom, carrying the gun, and the two talked and laughed, she further stated that just before the shooting, appellant suddenly asked Tanya what she was doing with the gun. According to Hicks, appellant did not question Tanya playing with the gun in the living room or in the bathroom until just before the shooting.

Additionally, contrary to Officer Zedella's and Det. O'Malley's testimony, Hicks testified that she informed the police officers at the hospital as to where the gun was located. Both officers testified that Hicks was uncooperative at the hospital and at Sixth District headquarters.

■■■ Thus, a review of the record reveals that it was appellant's evidence which was contradictory, conflicting and fragmentary, and it was appellant's chief witness, Hicks, whose testimony was impeached. It is well established that the weight of the evidence and the credibility of the witnesses are primarily matters for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *State v. Mann* (1993), 93 Ohio App.3d 301, 310, 638 N.E.2d 585, 590–591. It is not the function of an appellate court to substitute its judgment for that of the factfinder. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 616 N.E.2d 909; *State v. Ervin* (1991), 75 Ohio App.3d 275, 599 N.E.2d 366. The jury was thus entitled to believe the testimony of the state's witnesses over the testimony of appellant. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548; *Mann, supra.*

Accordingly, this court concludes appellant's conviction for murder in violation of R.C. 2903.02 is supported with sufficient evidence and is not against the manifest weight of the evidence.

Appellant's first and second assignments of error are, therefore, overruled.

## II

In support of appellant's third assignment of error, appellant argues that a review of the voir dire of Wentzel reveals that the state failed to qualify him as an expert in the area of crime scene reconstruction. Next, appellant argues that Wentzel's testimony was not based on "good grounds or scientific knowledge" sufficient to establish a standard of evidentiary reliability.

It is well established that Ohio applies the "relevancy standard" for the admission of expert testimony. *State v. Pierce* (1992), 64 Ohio St.3d 490, 495, 597 N.E.2d 107, 111; *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Under the relevancy standard, the admissibility of expert testimony is governed by Evid.R. 402, 403 and 702. *Id.* The test is whether the questioned evidence is relevant and will assist the trier of fact in understanding evidence presented or in determining a fact in issue. *Id.*

Evid.R. 402 states:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible."

However, Evid.R. 403(A) mandates the exclusion of relevant evidence if its probative value is outweighed by danger of unfair prejudice, confusion of the issues or misleading of the jury. *State v. Williams, supra,* 4 Ohio St.3d at 58, 4 OBR at 148, 446 N.E.2d at 447–448.

Finally, Evid.R. 702 [1] provided:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In *Pierce, supra,* 64 Ohio St.3d at 496, 597 N.E.2d at 111–112, the Ohio Supreme Court made the following comments concerning the relevancy standard:

" ' * * * We believe the Rules of Evidence establish adequate preconditions for admissibility of expert testimony, and we leave to the discretion of this state's judiciary, on a case by case basis, to decide whether the questioned testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue.'

" 'The relevancy standard balances the probativeness, materiality, and reliability of the evidence against the risk of misleading or confusing the jury or unfairly prejudicing the defendant. This approach makes all expert testimony on generally recognized tests presumptively admissible and places the burden of excluding the evidence on the opponent.' " (Citations omitted.)

---

1. Evid.R. 702 was amended, effective July 1, 1994, to read:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

■ While Evid.R. 702 permits a witness to testify as an expert if his opinion or testimony will aid the trier of fact in search of the truth, a threshold determination must first be made in accordance with Evid.R. 104(A) concerning the qualification of the witness to testify as an expert. *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603.

■ In determining the admissibility of an expert witness's testimony, the court must consider whether that witness will aid the trier of fact in search of the truth. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566–567; *State v. Gaines* (1992), 82 Ohio App.3d 467, 471, 612 N.E.2d 749, 750–751. In addition, a person may be qualified as an expert witness if the proponent of such witness can establish that the witness has knowledge of scientific, technical or other such specialized nature. See Evid.R. 702; *Landskroner v. Pub. Util. Comm.* (1983), 5 Ohio St.3d 96, 5 OBR 176, 449 N.E.2d 760; and *State v. Buehler* (Jan. 29, 1987), Cuyahoga App. No. 51522, unreported, 1987 WL 4742. Such witness may be qualified as an expert based on special knowledge, skill, experience, training or education. Evid.R. 702.

■ The determination of whether a witness possesses the qualifications necessary to allow his expert testimony lies within the sound discretion of the trial court. *State v. Wages* (1993), 87 Ohio App.3d 780, 786, 623 N.E.2d 193, 197; *State v. Williams* (1992), 80 Ohio App.3d 648, 655, 610 N.E.2d 545, 549. Such determination will not be reversed by an appellate court unless there is a clear showing of an abuse of discretion on the part of the trial court. *State v. Maupin* (1975), 42 Ohio St.2d 473, 71 O.O.2d 485, 330 N.E.2d 708; *State v. Minor* (1987), 47 Ohio App.3d 22, 546 N.E.2d 1343.

■ This court's review of the record leads us to conclude that James T. Wentzel was properly qualified as an expert witness in the field of crime scene reconstruction, using computer-assisted or electronic drafting. Prior to testifying before the jury, the trial court conducted a preliminary voir dire of Wentzel to determine competency. Wentzel is a forensic photographer who has been employed by the Cuyahoga County Coroner's Office since October 1985. His duties with the coroner's office vary from case to case but include photographing all of the decedents who are brought into the office, photographing evidence, photographing and measuring crime scenes, and conducting crime scene reconstructions, imprint analysis and pattern transfer analysis. Wentzel also does work on bullet trajectory, blood flight characteristics and blood splatterings.

An additional part of Wentzel's responsibilities involves electronic drafting of crime scenes. He studied aeronautical engineering for two years at Tri–State University in Angola, Indiana. He explained the study of aeronautical engineering includes math and physics which he applies "quite a bit" to crime scene

reconstruction. Wentzel also studied industrial design at the Cleveland Institute of Art. He also explained that the study of industrial design includes studying drafting techniques. He is also certified by the Ohio Attorney General to teach at the Ohio Peace Officer Basic Training Program.

Since starting at the coroner's office, Wentzel has taken considerable amount of continuing education studies. He took a course in Tire Imprint Evidence at the Midwestern Association of Forensic Scientists and attended the Hospital Photojournalism School at Akron Children's Hospital, which was sponsored by the Biological Photographers Association. Wentzel has published some works and received a grant with Dr. Elizabeth Robinson from the National Institute of Justice for research in Toneline Bite Mark Photography. Wentzel has also lectured to law enforcement agencies throughout this and other counties and has testified in trials in this and Huron County.

Wentzel has done twenty to thirty crime scene reconstructions and approximately ten to fifteen with the aid of a computer. He uses an IBM compatible computer and AutoCAD analysis. AutoCAD refers to the software on the computer. Essentially, AutoCAD software is an electronic drafting table. Wentzel explained that the actual mechanics of the AutoCAD software are the same as if the drafting were conducted on a piece of paper.

Wentzel further explained the process involved in drafting on the AutoCAD software. For each case, Wentzel uses the specific measurements of the scene to be reconstructed. In the present case, Wentzel used the specific dimensions of the bathroom and the specific length and height of the bathtub. By inputing the dimensions into the computer, the AutoCAD software actually drafts the bathroom and the bathtub using these dimensions. Using the AutoCAD software, Wentzel was able to draft a three-dimensional reconstruction of the bathroom where the shooting took place and was able to rotate the reconstructed bathroom on the computer rather than having to draft additional drawings. The data given to Wentzel for input into the computer were provided by Det. O'Malley and Sharon Rosenburg. Such data included the dimensions of the crime scene, *i.e.*, the bathroom, the dimensions of the bathtub, where the fixtures were located, how wide the walls were, and the location of the defect or bullet hole. Sharon Rosenburg provided the muzzle-to-target distance of at least thirty inches. Wentzel also received information from the autopsy protocol, such as the height, weight and other physical dimensions of the body.

On cross-examination, Wentzel explained that after two years at Tri–State, he transferred to the Cleveland Institute of Art although he did not receive a degree. Wentzel also indicated that the courses in hospital photojournalism and tire imprint analysis are not related to AutoCAD analysis. With respect to the toneline bite mark photography, Wentzel explained that he and Dr. Robinson

developed a method to photograph bite marks in order to match those with a suspect's dental impressions. Such method, Wentzel explained, eliminates examiner bias.

Wentzel testified that he is aware of one other individual who uses similar software and who does consulting work for the National Transportation Safety Board. According to Wentzel, this individual uses another software program to simulate aircraft crashes and has testified in court using very similar methodology. However, Wentzel's particular computer and the AutoCAD software have never been used, to his knowledge, in a courtroom. Wentzel was unable to say one way or the other whether the use of AutoCAD software has been specifically accepted in the scientific community. Wentzel has never testified before a court concerning AutoCAD software.

Wentzel confirmed that his results are only as accurate as the measurements provided to him. Not only must the methodology be correct but so, too, must the information which is provided him.

Upon questioning from the trial judge, Wentzel stated that he believed that in using the AutoCAD software, he could exclude certain areas of the bathroom where the gun could have been fired and he could exclude various positions that the victim might have been in when she was shot. Wentzel explained that he could place, in general terms, where the gun and the body might have been located when the fatal shot was fired. In essence, Wentzel's testimony was offered to prove that the version of events as explained by appellant to the investigating officers was impossible. Wentzel's testimony was not offered to explain how the killing took place.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in qualifying Wentzel as an expert witness in the field of crime scene reconstruction, using computer-assisted or electronic drafting techniques.

This court's decision in *Deffinbaugh v. Ohio Turnpike Comm.* (1990), 67 Ohio App.3d 692, 588 N.E.2d 189, provides strong support for our conclusion that Wentzel was properly qualified to testify as an expert witness in the field of crime scene reconstruction using computer-assisted drafting. It has been suggested, however, that, unlike the expert in *Deffinbaugh,* Wentzel is not a professional engineer. Nonetheless, it must be pointed out that Wentzel has performed a total of twenty to thirty crime scene reconstructions, including ten to fifteen on the AutoCAD software. Additionally, it should be stressed that possession of a college degree is not a *per se* prerequisite to testifying as an expert witness. See Evid.R. 702; *Buehler, supra* ("A person may be qualified as an expert [based on] * * * special study, experience or observation not within the common knowledge of laymen."). In the present case, Wentzel was qualified to testify based on special study and experience. Wentzel testified to having been educated in

aeronautical engineering, which included studies in math and physics. He explained that he applies math and physics "quite a bit" to his work in accident reconstruction. After spending two years studying aeronautical engineering, Wentzel studied industrial design at the prestigious Cleveland Institute of Art. His studies in industrial design included training in drafting and are obviously relevant and important to his work for the coroner's office in computer-assisted or electronic drafting.

Considering Wentzel's formal education in aeronautical engineering and industrial design, together with his practical experiences while reconstructing twenty to thirty different crime scenes, ten to fifteen of which used the AutoCAD software, this court believes the trial court properly determined that Wentzel had the requisite scientific, technical or other specialized knowledge to testify as an expert witness in the field of crime scene reconstruction, using computer-assisted or electronic drafting techniques. The record fully supports the conclusion that Wentzel obtained such scientific, technical or other specialized knowledge through his work experience and through education received prior to and during his work at the coroner's office. His studies in aeronautical engineering and industrial design, his on-the-job training and his continuing education all provide him with the relevant scientific, technical or other specialized knowledge to testify as an expert.

Before expert testimony can be admitted, the trial court must also determine such testimony will aid the trier of fact in search of the truth. As previously stated, the standard for the admissibility of expert testimony in Ohio is whether the questioned evidence is relevant and will assist the trier of fact in understanding evidence presented or in determining a fact in issue. *Pierce, supra,* 64 Ohio St.3d at 497, 597 N.E.2d at 112–113; *Williams, supra,* 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444. However, the reliability of the expert testimony in a given case goes to the weight of the evidence rather than its admissibility. *Pierce, supra,* at 501, 597 N.E.2d at 115–116. No pretrial evidentiary hearing is necessary to determine the reliability of the evidence; rather, it is the reliability of the methodology employed to obtain the evidence which must be considered. *Id.*

In this regard, the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469, provides a useful analysis. In *Daubert,* the Supreme Court explained that the term "scientific * * * knowledge," found in Fed.R.Evid. 702, implies a "grounding in the methods and procedures of science." *Id.* at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 480–481. "Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." Thus, "[i]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the

scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481. The last requirement of Fed.R.Evid. 702 is that the evidence assist the trier of fact to understand or determine an issue of fact. *Id.* at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 480–481. This final requirement goes primarily to the relevancy of the proffered testimony.

■■■■ Because Fed.R.Evid. 702 was identical to Ohio's former Evid.R. 702, the requirements that the proffered evidence be based on "scientific knowledge" should be explored further. In *Daubert,* the Supreme Court set forth various guidelines to assist the trial court in determining whether the evidence is based on "scientific knowledge." The court explained that the trial court must engage in a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. Key questions for resolution by the trial court include: whether the reasoning or methodology can be or has been tested; whether the theory or technique has been subjected to peer review and publication; considerations of the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and, finally, considerations of whether the methods or techniques have gained "general acceptance" should be considered.

At first glance, the considerations outlined in *Daubert* might appear to be pertinent to the case at bar; however, *Daubert* makes clear that these considerations apply to "*scientific* knowledge." *Id.* at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481, fn. 8. In *Daubert,* the scientific evidence sought to be admitted was the testimony of experts who concluded that a prenatal drug can cause birth defects based on animal studies, chemical structure analyses, and unpublished "reanalysis of previously published human statistical studies." The court ultimately remanded the case to the district court for further consideration, applying the newly enunciated guidelines. Other examples of evidence concerning "scientific knowledge" would include DNA evidence, see *Pierce, supra,* 64 Ohio St.3d 490, 597 N.E.2d 107; stenographic voice analysis, see *Williams, supra,* 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444; forensic serology, see *Wages, supra,* 87 Ohio App.3d 780, 623 N.E.2d 193; and statistics on blood types, *State v. Robles* (1989), 65 Ohio App.3d 104, 583 N.E.2d 318.

■■■ The question of whether crime scene or accident reconstruction utilizing computer-assisted or electronic drafting techniques, we believe, more reasonably falls within the realm of "technical or other specialized knowledge" within the meaning of Evid.R. 702. Because the testimony of accident or crime scene

reconstructionists is based more precisely on "technical or other specialized knowledge," the factors enunciated in the *Daubert* decision do not provide sufficient guidance to be of use *sub judice.*

In this light, it must be pointed out that other jurisdictions have created guidelines which should be of assistance to Ohio courts in determining whether a witness will be permitted to testify as to his reconstruction of an accident or crime scene, utilizing a computer-generated simulation or reconstruction. In *Commercial Union Ins. Co. v. Boston Edison Co.* (1992), 412 Mass. 545, 591 N.E.2d 165, the Supreme Court of Massachusetts held:

"[W]e treat computer-generated models or simulations like other scientific tests, and condition admissibility on a sufficient showing that: (1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and (3) the program is generally accepted by the appropriate community of scientists." *Id.* at 548, 591 N.E.2d at 168.

At least one additional court has adopted the same test, see *Kudlacek v. Fiat S.p.A.* (1994), 244 Neb. 822, 842–843, 509 N.W.2d 603, 617.

■■ Both of the above courts applied the enunciated guidelines and determined that computer simulations were properly admitted at trial. Moreover, while the third prong of the test invokes the *Frye* [*v. United States* (C.A.D.C., 1923), 293 F. 1013] test, which has been rejected in Ohio, see *Williams, supra,* we believe the fact that other jurisdictions, including our own, allow for the admission of computer-generated simulations or reconstructions speaks for the reliability of such simulations within the relevant technical community. See *Deffinbaugh, supra,* 67 Ohio App.3d 692, 588 N.E.2d 189 (two computer-generated simulations of a car accident were properly admitted at trial); *Commercial Union, supra,* 412 Mass. 545, 591 N.E.2d 165 (computer-generated model for estimating energy usage was admissible); *Kudlacek, supra,* 244 Neb. 822, 509 N.W.2d 603 (expert testimony regarding computer simulation of the path of an automobile on a roadway was properly admitted); *Seattle Master Builders Assn. v. Pacific Northwest Elec. Power & Conservation Planning Council* (C.A.9, 1986), 786 F.2d 1359, 1370 (allowing the use of computer simulations of value of energy conservation methods based on principles derived from the American Society of Heating, Refrigerating and Air Conditioning Engineers' "Handbook of Fundamentals" to determine energy conservation value); *Perma Research & Dev. v. Singer Co.* (C.A.2, 1976), 542 F.2d 111, 115 (results of computer simulation were used to form the basis of expert testimony regarding the feasibility of perfection of an automobile anti-skid device); *United States v. Dioguardi* (C.A.2, 1972), 428 F.2d 1033, 1037 (computer analysis was employed to determine when defendant would have exhausted his inventory had he not concealed assets); *Pearl Brewing Co. v.*

*Joseph Schlitz Brewing Co.* (S.D.Tex., 1976), 415 F.Supp. 1122, 1134 (computer simulation was used to test varying market conditions in price-fixing case); *United States v. United Technologies Corp.* (1977), 1977–2 Trade Cas. (CCH) par. 61, 647, 1977 WL 1470 (econometric model was used in antitrust case); *In re Sugar Indus. Antitrust Litigation* (E.D.Pa., 1976), 73 F.R.D. 322, 353 (expert could rely on statistical model to formulate his opinion as to class damages in complex antitrust case); *Messex v. Louisiana Dept. of Highways* (La.App.1974), 302 So.2d 40, 44 (computer simulation of automobile accident was used to assist court in determining whether the defendant had reasonable opportunity to avoid accident); *Haley v. Pan Am. World Airways, Inc.* (C.A.5, 1984), 746 F.2d 311 (videotape simulation offered to support pre-impact fear prior to plaintiff's death in an airplane crash); *Holland v. Dick Youngberg Chevrolet–Buick, Inc.* (Minn. App.1984), 348 N.W.2d 770 (computer simulated test was conducted to show a truck could achieve a speed of fifty-five m.p.h. with a full load and was not substantially impaired); and *People v. McHugh* (Sup.1984), 124 Misc.2d 559, 476 N.Y.S.2d 721 (computer simulation of car crash was admitted in second degree manslaughter prosecution). Further, the fact that computer-generated simulations are generally recognized places the burden of excluding such testimony on appellant. *Pierce, supra,* 64 Ohio St.3d 490, 597 N.E.2d 107.

 A review of Wentzel's voir dire testimony leads this court to conclude that the methodology or principles underlying his testimony were sufficiently reliable under the test enunciated in *Commercial Union Ins.* and *Kudlacek, supra.* At the voir dire, appellant's counsel never questioned whether the computer system was functioning properly. Moreover, although appellant raised concern over whether the AutoCAD software was generally accepted in the "scientific" community, we believe the field of crime scene reconstruction through the use of computer-generated simulations or computer-assisted drafting has gained general acceptance, as evidenced by the numerous courts which have admitted computer simulations or reconstructions as evidence. Additionally, Wentzel did testify that at least one other individual had utilized similar software to reconstruct aircraft accidents and that such individual has testified at a trial.

It remains, however, to be determined whether the input and underlying equations were sufficiently complete and accurate to be deemed reliable. Further, it remains to be determined whether the input and underlying equations were disclosed to the other party in sufficient time so that appellant might challenge them. At the voir dire, Wentzel testified that the data given to him for input into the computer were provided by Det. O'Malley and Sharon Rosenburg and included the dimensions of the crime scene, *i.e.*, the dimensions of the bathroom, the dimensions of the bathtub, where the fixtures were located and the location of the defect or bullet hole. Rosenburg provided the muzzle-to-target

distance, and information concerning the dimensions of the decedent was obtained from the autopsy protocol.

Additionally, the record discloses that all relevant expert reports were provided to appellant's counsel well in advance of trial. The record discloses that appellant's counsel requested, and was provided, all relevant discovery, including the names of all witnesses whom the state intended to call at trial, and appellant was provided the results or reports of any and all scientific or technical tests or experiments made in connection with this case, including the report prepared by Wentzel. Additionally, appellant had the opportunity to bring the issue of the admissibility of Wentzel's expert testimony to the attention of the trial court well before trial. The record reveals that appellant's counsel was provided a copy of Wentzel's report as early as February 4, 1993. Finally, at trial, appellant's counsel did not raise the issue of inadequate discovery of Wentzel's testimony and/or report. Thus, appellant's counsel was provided all discovery pertinent to Wentzel's testimony so that adequate preparation and cross-examination could be achieved. Thus, the trial court's reluctance in admitting Wentzel's testimony, *i.e.*, that it should have been brought to the trial court's attention earlier, falls squarely on appellant's shoulders as no motion *in limine* was filed and appellant otherwise failed to bring it to the trial court's attention.

Last, it remains to be determined whether the trial court abused its discretion in determining that Wentzel's proffered testimony was relevant and not unduly prejudicial to appellant. Clearly, Wentzel's testimony would assist the factfinder in search of the truth. Such evidence tended to make the existence of an accidental shooting less probable. Evid.R. 401. Wentzel explained that in using the AutoCAD software, he could exclude certain areas of the bathroom where the gun could have been fired and he could exclude various positions that the victim might have been in when she was shot. Wentzel's testimony, then, was clearly relevant. The fact that Wentzel was able to reconstruct the crime scene in a scenario described as being "the most likely" scenario does not affect the relevance of his testimony. Rather, it must be remembered that the reliability and weight of evidence is chiefly a concern of the trier of fact. The reliability of methodology or techniques used to obtain such evidence is a question for the court to decide.

Next, this court must decide whether the probative value of Wentzel's testimony was substantially outweighed by the danger of unfair prejudice to appellant. Evid.R. 403(A). Based on our review of the record, we conclude that any danger of unfair prejudice to appellant was prevented through the state's timely disclosure of Wentzel's expert report, appellant's counsel's opportunity to voir dire the witness prior to such witness's testimony at trial, and counsel's engaging in a vigorous cross-examination of Wentzel at trial. Additionally, all of

the data or input which were used to reconstruct the crime scene through the AutoCAD software were available to appellant's counsel prior to and during trial and were disclosed to the jury as well.

Based on the foregoing, this court concludes that the trial court properly admitted Wentzel's expert testimony or opinion on the subject of crime scene reconstruction using the computer-assisted or electronic drafting software package known as AutoCAD. Wentzel was properly found to possess the requisite "scientific, technical or otherwise specialized knowledge" obtained through appropriate "knowledge, skill, experience, training or education." The basis for Wentzel's testimony was further properly found to be reliable and relevant to the issues at bar. Therefore, the record does not reflect an abuse of discretion on the part of the trial court.

Finally, even assuming the trial court abused its discretion in admitting Wentzel's testimony, and we believe the trial court did not, this court concludes such error is harmless beyond a reasonable doubt. Crim.R. 52(A); *Williams, supra*, 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444. Appellant's inconsistent version of the shooting, coupled with the forensic evidence, the lack of fouling or stippling on the victim's clothing, the fact that the gunshot residue test and the trace metal detection test provided no evidence that the victim ever handled the gun, and the fact that the gun could not fire accidentally, provides overwhelming proof that the shooting was no accident.

Appellant's third assignment of error is, therefore, overruled.

### III

Appellant's fourth and fifth assignments of error center around the issue of whether the trial court should have given a jury charge on the lesser included offense of involuntary manslaughter. Appellant first suggests, in his fourth assignment of error, that the trial court committed plain error in failing to instruct the jury on involuntary manslaughter. Appellant next argues, in his fifth assignment of error, that his trial counsel was ineffective in failing to request such charge.

Whether a lesser included offense should be submitted to the jury depends upon the record of each case. *State v. Jenkins* (1976), 48 Ohio App.2d 99, 2 O.O.3d 73, 355 N.E.2d 825; *State v. Osburn* (1976), 52 Ohio App.2d 146, 6 O.O.3d 116, 368 N.E.2d 849. A criminal defendant is entitled to a charge on a lesser included offense only where the evidence warrants it. *State v. Kidder* (1987), 32 Ohio St.3d 279, 280, 513 N.E.2d 311, 313–314; *State v. Kilby* (1977), 50 Ohio St.2d 21, 4 O.O.3d 80, 361 N.E.2d 1336; and *State v. Nolton* (1969), 19 Ohio St.2d 133, 48 O.O.2d 119, 249 N.E.2d 797.

 It is not contested that involuntary manslaughter (R.C. 2903.04) is a lesser included offense of murder (R.C. 2903.02). *State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286, 289–290; *Kidder, supra;* and *State v. Coulter* (1992), 75 Ohio App.3d 219, 225, 598 N.E.2d 1324, 1327–1328. However, it is settled that even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where there is evidence presented at trial that would reasonably support an acquittal on the crime charged and a conviction upon the lesser included offense. *Thomas, supra; Coulter, supra.*

 R.C. 2903.04 (the involuntary manslaughter statute) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit * * * a misdemeanor or a felony." Thus, in order for appellant to have been entitled to a charge on involuntary manslaughter, the evidence adduced at trial must have reasonably supported an acquittal on the murder charge and a conviction upon the lesser included offense.

A review of the record, however, reveals that there exists absolutely no evidence that appellant caused the death of Tanya Banks while committing a misdemeanor or a felony. The only evidence offered by appellant was that the shooting was accidental.

Appellant was, therefore, not entitled to an instruction on the lesser included offense of involuntary manslaughter, and the trial court did not commit error in not instructing the jury on involuntary manslaughter. Moreover, since there exists no evidence to support a charge on involuntary manslaughter, appellant's counsel was not ineffective in failing to request such charge.

Appellant's fourth and fifth assignments of error are, therefore, not well taken.

## IV

In appellant's sixth and seventh assignments of error, appellant claims he was unduly prejudiced by the latitude of direct and cross-examination afforded the prosecution. Appellant argues this was a violation of his Sixth Amendment right to a fair trial and should have resulted in a mistrial.

The record before this court, however, does not reveal that a motion for a mistrial was ever made. The record does reveal that appellant's counsel proffered for the record, and outside the court's presence, that he wished to move for a mistrial on the basis of alleged improper conduct by the prosecution during closing arguments. Later, the trial court, on the record, granted appellant's motion to stay execution of the sentence for at least three weeks so that counsel could prepare a motion for a new trial. Nonetheless, the record does not contain a motion for a new trial nor does it contain a motion for a mistrial. Appellant's

seventh assignment of error should therefore be overruled since a motion for a mistrial was never made.

Appellant further claims that the following exchange between Det. O'Malley and the prosecutor deprived him of a fair trial:

"Q. Detective [O'Malley], did you make an effort to locate Tony Bush [who] was at the scene of the homicide back on July 25th?

"A. Yes, I did.

"Q. What efforts did you make to locate Tony Bush?

"A. In looking up his record there were three addresses listed, at 13708 Glendale from 1989, at 837 East 139th from 1989 and 3778 East 78th of 1991. And also an address was provided at 1031 Galewood. All these addresses proved negative. And the Galewood address, the most current address, proved to be a boarded up drug house.

"I contacted the Rope Unit to try and locate him without any success.

"Q. That last address was provided by who[m]?

"A. By defense counsel.

"Q. In the course of discovery in the case?

"A. That's correct.

"Q. Now, is there on St. Clair Avenue an EMS Rescue Squad located near the scene of this homicide?

"A. Yes, there is.

"Q. Where is that located?

"A. It is approximately East 152nd and St. Clair, the fire station.

"Q. And where is that in relation to Nye Avenue?

"A. It's about two or three minutes away.

"Q. Getting back to Tony Bush, were you ever able to locate him?

"A. I never could find him, neither could the Rope Unit.

"Q. What is the Rope Unit?

"A. That is the repeat offender program.

"Q. What are their duties?

"A. Their duties are to locate wanted felons and incorporate narcotic investigations and any investigations by the Chief of Police.

"Q. Was Tony Bush wanted during this time period?

"A. Computer revealed that he was wanted on a County capias for felonious assault and that was verified through the Sheriff's office.

"MR. MILANO: Objection to all of this as to relevance.

"THE COURT: Overruled."

Under Evid.R. 611(A), the mode and order of interrogation of witnesses is left to the sound discretion of the trial court. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828; *State v. Davis* (1992), 79 Ohio App.3d 450, 607 N.E.2d 543. Further, the admission of relevant evidence is also left to the discretion of the trial court. Evid.R. 402; *State v. Lyles* (1989), 42 Ohio St.3d 98, 537 N.E.2d 221; *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. Relevant evidence is not limited to merely direct evidence tending to prove a claim or a defense. *State v. Moore* (1988), 40 Ohio St.3d 63, 531 N.E.2d 691. Circumstantial evidence bearing upon the probative value of other evidence in a case can be of consequence to the action. *Id.* Thus, evidence establishing or impeaching the credibility of witnesses is of consequence to the action because it might determine whether the jury believes a particular witness. *Id.*

In the present case, the credibility of Det. O'Malley and the thoroughness of his investigation were at issue. Throughout trial, appellant's counsel took exception to O'Malley's failure to obtain written statements from various witnesses to the events surrounding the shooting, including appellant and Hicks. Thus, information concerning O'Malley's efforts to question another witness to the events surrounding the shooting was certainly relevant to counter the argument that O'Malley's investigation was somehow inadequate. Finally, appellant's claim that such testimony was merely an attempt to condemn appellant through "guilt by association" with his brother fails since such evidence tends to counter the attacks against the adequacy of O'Malley's investigation.

Appellant also claims that the following questioning of Nicki Hicks on cross-examination was unfairly prejudicial:

"Q. What did [appellant] do for a living?

"A. I don't know.

"Q. Did he work?

"A. I don't know.

"Q. Did you see him go to work?

"A. I didn't really, me and Lamont really didn't talk.

"Q. I didn't hear that.

"A. I didn't pay attention. I didn't know what he did.

"Q. You didn't know what he did?

"A. No.

"Q. You never saw him go to work a day in his life, did you?

"A. I don't know.

"Q. Did he, yes or no?

"A. No.

"Q. Did he have a car in July of 1992?

"A. Yes.

"Q. How many cars did he have?

"A. One.

"Q. And was that a Taurus?

"A. That wasn't his.

"Q. All right. What kind of a car did he have in July of 1992?

"A. A Blazer.

"MR. PAULOZZI: Objection to this whole line of questioning.

"THE COURT: Overruled.

"Q. How did he support Tonya [*sic*] and the two kids?

"A. I don't know. I don't know nothing about their income.

"Q. You spent a lot of time there, didn't you?

"A. That don't mean I know about his income. .

"Q. You didn't know anything about his income, how did the kids survive, how did they eat and how did they live there at this apartment, do you know?

"A. No.

"Q. Tonya [*sic*] did not work at the time, did she?

"A. No."

 ▮▮▮▮▮ Appellant argues this line of questioning was an attempt to prejudicially allude to other illegal activities in which appellant may have engaged in order to support himself, Tanya and the children. Under Evid.R. 611(B), a trial court retains wide latitude over the scope of cross-examination. *State v. Rapp* (1990), 67 Ohio App.3d 33, 36, 585 N.E.2d 965, 967–968. However, it has been held that attempts to communicate to the jury by innuendo through the questioning of witnesses when the questioner has no evidence to support the innuendo are

improper. *State v. Gillard* (1988), 40 Ohio St.3d 226, 230, 533 N.E.2d 272, 277; *State v. Williams* (1977), 51 Ohio St.2d 112, 119, 5 O.O.3d 98, 102, 364 N.E.2d 1364, 1368. Moreover, it has been held that, in general, an accused's socio-economic status is irrelevant. *State v. Jacks* (1989), 63 Ohio App.3d 200, 209, 578 N.E.2d 512, 517–518; *State v. Page* (Aug. 18, 1988), Cuyahoga App. No. 54252, unreported, 1988 WL 88347; *State v. Cox* (June 30, 1992), Lawrence App. No. 91 CA 12, unreported, 1992 WL 154145.

In the present case, we fail to see how appellant's rights were prejudiced by this line of questioning. Hicks's testimony did little to support a claim that appellant was engaged in some other form of illegal activity. Hicks simply did not know what appellant did for a living. Additionally, Hicks's testimony did not establish or reinforce an attack on appellant's socio-economic status. See *State v. Wright* (Feb. 27, 1992), Cuyahoga App. No. 59952, unreported, 1992 WL 38385; *State v. Moman* (June 27, 1990), Adams App. No. 491, unreported, 1990 WL 85195. Finally, we note that any impact this line of questioning may have had on the jury was diminished in significance by appellant's witness and next-door neighbor, Emma Wright, who testified that appellant worked at a gas station.

Appellant's sixth and seventh assignments of error are, therefore, overruled.

## V

In appellant's final assignment of error, appellant argues the trial court committed reversible error in failing to give the standard jury instruction with respect to a police officer's credibility. The record before this court, however, reveals that the trial court requested that both parties provide written instructions on all requested charges. In fact, the trial court informed appellant's counsel that if appellant could find it in the Ohio Jury Instructions, it would be given. Nonetheless, counsel failed to provide a written instruction, and it was not given.

It has been held that a jury should be given such instruction, when warranted, to the effect that a police officer is not, by virtue of that status, deemed to be more credible than any other witness, but, instead, his credibility and the weight to be given his testimony are to be judged upon the same standard as other witnesses'. *State v. Broadus* (1984), 14 Ohio App.3d 443, 445, 14 OBR 563, 564–565, 472 N.E.2d 50, 51–52; *State v. Wenhart* (May 29, 1991), Medina App. No. 1967, unreported, 1991 WL 95261. In the present case, the trial court would have given such instruction had appellant's counsel provided the court with a written charge. Appellant's counsel failed to do so, and this court cannot conclude such failure amounts to plain error. Crim.R. 52(B); *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 4 OBR 580, 448 N.E.2d 452. Additionally,

the trial court did give the standard charge that the jury was the sole judge of the facts, the credibility of witnesses and the weight of the evidence. R.C. 2945.11. Thus, any error in the court's failure to include such charge is harmless beyond reasonable doubt.

Accordingly, appellant's final assignment of error is overruled.

The judgment of the lower court is affirmed.

*Judgment affirmed.*

WEAVER, J., concurs.

JAMES D. SWEENEY, J., dissents.

JAMES D. SWEENEY, Judge, dissenting.

I must respectfully dissent. The appellant's third assignment of error has merit, and this case should be reversed and remanded for a new trial. The trial court erred in admitting the testimony of the state's expert witness, James Wentzel, which was materially prejudicial to the appellant. The state failed to present any evidence to show that Wentzel's reconstruction of the crime scene using AutoCAD (computer-aided design) was definite enough to be of use to the jury or to show that he was qualified as an expert witness.

At trial, Wentzel testified that his responsibilities at the Cuyahoga County Coroner's Office included taking photographs, measuring crime scenes, reconstructions, imprint analysis, pattern transfer analysis, bullet projectory, flight characteristics, and blood spatterings. He stated that he completed no degree but briefly studied aeronautical engineering from 1979 to 1981 and industrial design at an art institute from 1982 to 1984. Although he is certified to teach in the Ohio Peace Officer Basic Training Program, there was no testimony that he taught any courses related in any manner to crime scene reconstruction.

Wentzel reconstructed the crime scene *sub judice* using AutoCAD software. Wentzel testified that this software is used in lieu of a drafting table and is used for building bridges and buildings. Wentzel testified that he has performed a total of twenty to thirty crime scene reconstructions, and only in ten to fifteen of those has he used the AutoCAD. Wentzel knows of no other person using this technology to reconstruct crime scenes, and prior to this case, he has never testified regarding reconstructions of criminal cases. Similarly, he testified he was unaware if it was accepted by the scientific community and further that this was the first time this type of testimony was proffered in a criminal case in Cuyahoga County.

Several assumptions were made by Wentzel in reaching his conclusions. Although he is not a doctor, and he cited no authority, Wentzel assumed that "it

is fairly likely that the bullet went in a straight line" through the body because the coroner testified that probably no bones were struck as the projectile passed through the body. He testified that if the bullet did deflect, he would be unable to accomplish a reconstruction. Given that Wentzel cannot be certain that the bullet did not deflect, his determinations, by his own admission, have no validity.

Wentzel stated that the results of his reconstructions are only as accurate as the measurements given to him, but admitted that he neither visited this crime scene nor personally took any of the measurements used in the analysis. It was quite clear in the testimony that it was impossible for Wentzel to place the appellant and the victim in their exact positions at the time of the fatal shot. The best he was able to do was to eliminate areas of the bathroom from where the gun could not have been discharged and exclude various positions that the victim's body might have been in when she was shot.

The Rules of Evidence provide the standard for admitting expert scientific testimony. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1994), 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469. Evid.R. 702 sets limits on the admissibility of purportedly scientific evidence, and the trial judge is assigned the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant. Here, an experienced trial judge stated that he would have preferred that the motion to exclude Wentzel's testimony be considered at a pretrial motion hearing so that more time would have been available to examine the law concerning opinion testimony. The trial court's misgivings were justified.

In *State v. Tomlin* (1992), 63 Ohio St.3d 724, 727–728, 590 N.E.2d 1253, 1256, the court detailed the standard for qualifying a witness as an expert:

"Evid.R. 702 provides that '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.' However, as a threshold to the introduction of expert testimony, the trial court must first determine if the expert is qualified under Evid.R. 104(A). See *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 168–169, 528 N.E.2d 603, 606; *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 18, 19 OBR 71, 83, 482 N.E.2d 955, 968; *State v. Wilson* (1982), 8 Ohio App.3d 216, 220–221, 8 OBR 288, 292, 456 N.E.2d 1287, 1292. 'The qualification of an expert is a matter for determination by the court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion.' *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713; see, also, *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 148, 524 N.E.2d 881, 886; *State v. Williams* (1983), 4 Ohio St.3d 53, 4

OBR 144, 446 N.E.2d 444, syllabus; *Frank v. Vulcan Materials Co.* (1988), 55 Ohio App.3d 153, 155, 563 N.E.2d 339, 342.

"As was noted by this court in *Alexander v. Mt. Carmel Medical Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566, 'It is a general rule that the expert witness is not required to be the best witness on the subject. * * * The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth.'" (Citations and footnote omitted.)

Additionally, in *State v. Jones* (1981), 67 Ohio St.2d 244, 252, 21 O.O.3d 152, 157, 423 N.E.2d 447, 452, the Supreme Court noted that the Sixth and Fourteenth Amendments to the United States Constitution do not compel a trial court to accept a witness as expert who is not qualified to give expert testimony.

In the case *sub judice*, Wentzel is clearly not an expert in crime scene reconstruction. When one considers his background, one must concede that there is not even the slightest indication that he qualifies by knowledge, skill, experience, training or education as an expert. He has performed only a minimal amount of reconstructions and has never before been qualified as an expert.

Specifically, Wentzel attended two years of college and two years of art school, but there is no mention of his use of any computer during those years, let alone AutoCAD software. In fact, nowhere in the testimony does Wentzel testify as to what, if any, coursework he took in the use of computers or any other type of computer training, how long he has used a computer, or his level of proficiency. He testified that AutoCAD is used in place of a drafting table but never informed the court whether he had even a single course in drafting. Wentzel possesses neither a junior college nor a four-year engineering or computer science degree. Although lack of a degree in and of itself does not preclude a witness from testifying as an expert, it was manifest that the witness had neither the experience nor the educational background to advance himself as an expert witness.

Finally, Wentzel primarily earns his living as a photographer. Although he performs other sundry tasks for the coroner's office, he does not have the requisite expertise to testify regarding the reconstruction of a crime scene. Wentzel has demonstrated at the very most that he may be a capable technician who has the ability to gather data, not that he is qualified to reach conclusions from that data.

I recognize that the witness underwent cross-examination, but that does not cure the deficiency of his being permitted to testify as an expert witness. I would reverse and remand this cause for a new trial since the testimony given by Wentzel was prejudicial to the appellant and the evidence of appellant's guilt is not otherwise overwhelming. This testimony did not aid the jury on its search

for the truth but rather obfuscates the overarching issue: whether or not the appellant was guilty of murder.