On June 3, 1997, appellant Jack Volgares angrily pushed his stepdaughter, seven year old Seleana Gamble, down the hallway of their Ironton home. Seleana lost consciousness and died several hours later. Appellant and his wife, Mona Volgares, buried Seleana in a trash can in the backyard and ultimately fled Ironton with their remaining three children.
A jury convicted appellant of murder, kidnapping, and obstruction of justice. The Lawrence County Court of Common Pleas sentenced appellant to consecutive terms totaling thirty-seven years to life imprisonment for these offenses and for appellant's prior pleas of guilty to endangering children, gross abuse of a corpse, and tampering with evidence. Volgares appeals his conviction and assigns eight errors for our review:
 "I. Did the trial court err as a matter of law when it refused to grant Defendant's motion for acquittal to kidnapping charges under R.C. § 2905.01(A)(5) when there was no evidence that the relocation and removal of the children by the custodial parents impeded, hindered or obstructed an ongoing investigation."
 "II. Did the trial court err as a matter of law when it refused to acquit the Defendant of murder pursuant to Crim. R. 29 when the evidence did not support all the elements of the statute, and the conviction was against the manifest weight of the evidence."
 "III. Did the trial court err as a matter of law when it sentenced the Defendant to consecutive terms while failing to make the necessary findings under R.C. §§ 2929.41 and 2929.14(E)."
 "IV. Did the trial court err as a matter of law when it sentenced the Defendant to consecutive terms for child endangerment and murder when the convictions were based upon allied offenses of similar import as they were based upon the same series of actions against the victim."
 "V. Did the trial court err when it failed to acquit the Defendant of obstruction of justice charges when the evidence showed that the Defendant misrepresented the whereabouts of the victim to family members in order to protect himself, not to protect his wife."
 "VI. Did the trial court err as a matter of law when it failed to exclude the opinion of Dr. Keith Norton in violation of Crim. R. 16 and Evid. R. 703."
 "VII. Was the defendant denied effective assistance of counsel at trial in violation of the Sixth Amendment when Defendant's counsel refused to call a single witness, request an independent autopsy, and personally interview the Defendant in depth."
 "VIII. Was the Defendant denied effective assistance of counsel at trial in violation of the Sixth Amendment when Defendant's counsel failed to object to Dr. Keith Norton's speculation that the victim would have had a better chance of survival had immediate treatment been sought, and when he failed to object to the State publishing a highly inflammatory piece of evidence to the jury when the piece was never offered as evidence."
We affirm appellant's conviction in all respects except the trial court's imposition of consecutive sentences. We remand for re-sentencing because the trial court failed to make the statutory findings necessary before imposing consecutive prison terms.
 I.
In June 1997, appellant lived in Ironton with his wife, Mona and four minor children in a home he rented from his brother. Seleana Gamble and her sister, Vivian Gamble, were Mona Volgares' two daughters from a previous marriage; Tesla and Jeremiah are the Volgares' natural children.
On June 3, 1997, Seleana was washing dishes in the kitchen of the family's home. Appellant became angry with Seleana for not washing the dishes correctly. Appellant screamed at Seleana, causing the young girl to urinate on herself, which she had done five to six times in the previous two weeks. Appellant ordered Seleana to her room.
A short time later, appellant noticed that Seleana was standing in the hallway and had not yet gone to her room as he ordered her to do. Appellant became even more angry at Seleana's failure to obey his instructions. Appellant, who is 6'1" and approximately 220 pounds, approached Seleana, placed his hands on her shoulders, spun her around, and threw her down the hall toward the girl's room. Seleana, who stood less than four feet tall and weighed fifty pounds, fell to the floor about six to eight feet from where appellant pushed her. After Seleana fell to the floor, her body began convulsing as if she was having a seizure. Seleana's jerking movements stopped, but she did not appear to be awake.
Seleana failed to awaken even after appellant picked her up and took her to the girl's bedroom. Appellant tried to revive Seleana by taking her to the bathtub and spraying her face with water from the shower. When these efforts failed, appellant and Mrs. Volgares changed the girl's clothes, put her in a nightgown, and placed her in a chair in the family room. Neither appellant nor his wife sought any medical treatment for Seleana.
Early the next morning, several hours after Seleana lost consciousness, appellant discovered that Seleana was dead. Appellant informed his wife of the girl's death and laid Seleana's body in her brother Jeremiah's bed for two days. Appellant and the rest of his family slept in the family room during the time Seleana's body rested in Jeremiah's room. Two days later, appellant wrapped Seleana's body in blankets and moved it to a crawl space underneath the home. While Seleana's body remained in the crawl space, Mrs. Volgares borrowed a post hole digger from a neighbor and dug a hole in the back yard of the home. When Mrs. Volgares finished digging, appellant put Seleana's body in a garbage can and placed it in the hole. Appellant covered the garbage can with a tarp and filled the hole.
In the two months following Seleana's death, several members of appellant's family inquired about Seleana's whereabouts. Sometime in June 1997, Marilyn Steorts, appellant's mother, had a conversation with appellant about Seleana. Appellant told Steorts that Seleana had gone to Florida to visit with her natural father and paternal grandparents. Approximately two months later, in August, appellant's family became suspicious when Seleana had not yet returned from Florida. With Seleana's August 10th birthday approaching, Steorts contacted Seleana's grandparents in Florida, inquiring whether she should send Seleana's birthday gifts there. Steorts became more concerned when she learned Seleana was not there. Steorts confronted appellant, who informed her that Seleana was with Mrs. Volgares' mother and father. Appellant also told Steorts that Mrs. Volgares had decided not to have Seleana return to Ironton for the beginning of the school year.
Appellant's sister, Terri Brammer, also became suspicious of Seleana's whereabouts. After learning that Seleana was not in Florida with her grandparents, Brammer made her own efforts to investigate what had happened to Seleana. On August 15, 1997, Brammer discovered that appellant's car was packed with boxes. The following day, Brammer learned that appellant had rented a Uhaul trailer. Armed with these facts on the night of August 16, 1997, Brammer told Ironton police of her concerns.
Appellant's brother, Nicholas Volgares, also inquired as to Seleana's whereabouts during August 1997. Appellant told Nicholas, just as he had told Steorts, that Seleana was with Mrs. Volgares' parents. Appellant promised Nicholas, however, that Seleana would speak with Steorts on August 17, 1997. Nicholas told appellant that he would contact Children's Services on August 18 unless Steorts heard from Seleana as promised. After Nicholas' ultimatum, appellant, Mrs. Volgares, and the three surviving children left their Ironton home in the early morning hours of August 17, 1997, without informing anyone of their departure. Brammer contacted Children's Services on August 18, 1997. The Ironton Police Department began a formal investigation on August 27, 1997 in an effort to locate Seleana and the family.
Nicholas Volgares owned the Ironton house in which appellant, Mrs. Volgares, and the children lived. Several days after his brother fled with Mrs. Volgares and the children, Nicholas began performing painting and repair work to the house to assist him in his efforts to sell it. Jim Steorts assisted Nicholas in performing work on the house. On September 6, 1997, while digging in the backyard of the home, Mr. Steorts discovered a garbage can buried near the house's chimney. The following day, police investigators unearthed the garbage can and discovered Seleana's partially decomposed body inside. Dr. Keith Norton of the Franklin County Coroner's office performed an autopsy on the body, but could not definitively determine the cause of death. This inability was due in large part to the body's advanced state of post-mortem decomposition.
Meanwhile, appellant and his family began a one-month odyssey covering several states before law enforcement authorities caught up with them. Appellant, his wife, and the children traveled to Ashland, Kentucky immediately after leaving Ironton. They spent a total of three nights in two different motels in Kentucky before leaving again. The family proceeded to the Detroit, Michigan area, where appellant had previously arranged to claim his Social Security check. They stayed one week in a Detroit area motel and approximately one more week with Mrs. Volgares' grandparents in Michigan. Following their stay in Michigan, the family went to Columbus, Ohio, where they rented an apartment and where Mrs. Volgares found employment. After only a few days in Columbus, appellant learned from the television news that authorities in Ironton had found Seleana's body. Appellant immediately gathered the children, picked Mrs. Volgares up from work, and left Columbus in the family's car. Appellant intended to proceed to New Mexico and eventually flee the country to Mexico.
On September 20, 1997, the story of Seleana's death and the family's disappearance aired on the network television show "America's Most Wanted." Within an hour of the show's broadcast, authorities arrested appellant and his wife in Muskogee, Oklahoma. The following day, appellant gave a taped statement to Detective James Sargent of the Ironton Police Department in which he admitted shoving Seleana, hiding Seleana's body after her death, and ultimately burying her in a garbage can in the backyard of their home.
The Lawrence County grand jury returned a thirteen count indictment against appellant. Appellant eventually entered guilty pleas to Endangering Children, Gross Abuse of a Corpse, and Tampering With Evidence. The trial court accepted these pleas and postponed sentencing on them until the jury returned a verdict on the remainder of the indictment. After a five-day trial, the jury found appellant guilty of Murder, three counts of Kidnapping, three counts of Obstructing Justice, and an unrelated count of Cultivation of Marihuana.
The court sentenced appellant for the various offenses, including those to which he had previously pled guilty. Appellant received fifteen years to life for murder; ten years for the kidnapping of Vivian Gamble; five years each for the kidnapping of Jeremiah and Tesla Volgares; one year each for the three obstructing justice counts; five years for child endangerment relating to Seleana Gamble; five years for tampering with evidence; one year for gross abuse of a corpse; and a fine for cultivation of marihuana. The court ordered that the kidnapping sentences be served concurrently with each other (for an aggregate of ten years) and that the obstructing justice sentences run concurrently with one another (for an aggregate of one year). However, the court ordered all other sentences to run consecutively, noting that it had "considered" the relevant consecutive sentencing factors contained in R.C.2929.14(E)(4). The court entered judgment, imposing a sentence on appellant of thirty-seven years to life imprisonment.
 II.
Appellant's first, second, and fifth assignments of error challenge the trial court's denial of his Crim.R. 29 motion for acquittal on the kidnapping, murder, and obstruction of justice counts. In each of these assignments of error, appellant argues that the trial court should have sustained his motion for acquittal because the state's case-in-chief failed to establish necessary elements to each charge. We disagree with appellant.
A Crim.R. 29(A) motion tests the sufficiency of the evidence presented at trial. See State v. Williams (1996), 74 Ohio St.3d 569,576; State v. Miley (1996), 114 Ohio App.3d 738, 742. Crim.R. 29(A) allows a trial court to enter a judgment of acquittal when the state's evidence is insufficient to sustain a conviction.[1] The trial court may not grant a defendant's Crim.R. 29(A) motion, however, "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. In making this determination, the trial court must construe the evidence in a light most favorable to the prosecution. Id. at 263. An appellate court undertakes de novo
review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all elements of the crime beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of syllabus; see, also, Miley, supra,114 Ohio App.3d at 742. If any rational trier of fact could have found the essential elements of an offense proven beyond a reasonable doubt, the appellate court will not disturb a conviction. Williams, 74 Ohio St.3d at 576; Jenks, 61 Ohio St. 3
d at 273.
With these standards in mind, we initially analyze the second assignment of error as it deals with murder, the most serious offense for which appellant was convicted. Ohio's murder statute states that "[n]o person shall purposely cause the death of another * * *." R.C. 2903.02(A). Appellant argues that he should have been acquitted of murder because the state presented insufficient evidence to show that appellant acted "purposely" in causing Seleana's death. Appellant argues that the only evidence of intent presented by the prosecution consisted of statements appellant made following his arrest. While his statements concede that he pushed Seleana down the hallway of their home, the appellant contends they do not indicate he intended to kill her.
A person acts "purposely" when he has the "specific intention" to cause a certain result. R.C. 2901.22(A).[2] It is presumed that a person intends the "natural, reasonable, and probable consequences of his voluntary acts." State v. Carter
(1992), 64 Ohio St.3d 218, 226. We must decide whether a reasonable jury could have found that appellant intended to cause Seleana Gamble's death.
Appellant emphasizes the lack of direct evidence indicating the intent to kill. Lack of direct evidence, however, does not lead to a conclusion that the prosecution failed to prove the requisite intent. A person's subjective mental state is not easily proven by direct evidence. Rather, "[i]t must ordinarily be proven by reference to the surrounding facts and circumstances." State v. Clark (1995), 101 Ohio App.3d 389,405; see, also, State v. Austin (1976), 52 Ohio App.2d 59, 68
(intent is a "question of fact that can be inferred from what the defendant did or said"). Thus, the jury may presume the requisite intent "where the natural and probable consequences of a defendant's action is to produce death and the jury may conclude, from all surrounding circumstances, that the defendant had an intention to kill." State v. Caldwell (1992),79 Ohio App.3d 667, 678; see, also, State v. Edwards (1985),26 Ohio App.3d 199, 200. So long as sufficient direct and circumstantial evidence exists to support a jury finding that a defendant intentionally killed the victim, the trial court properly overrules a Crim.R. 29(A) motion. See Clark,supra, 101 Ohio App.3d at 405.
Viewing the evidence in the light most favorable to the prosecution, we find several factors that could lead a rational juror to find that appellant harbored the requisite intent for murder. First, the jury considered appellant's initial conduct of roughly pushing or throwing Seleana down the hallway at a time when he was extremely angry with her. This act by appellant, who was considerably larger than Seleana, led to Seleana falling several feet away and immediately losing consciousness. Next, appellant's conduct following Seleana's loss of consciousness could have assisted a rational trier of fact in finding intent. Despite his stepdaughter going into convulsions and failing to awaken, appellant did not seek medical treatment for her at any time. Appellant had several hours before Seleana's death to seek medical aid, but did not do so. The jury could have seen the initial contact, in conjunction with the failure to obtain medical aid, as such a blatant disregard for Seleana's well-being that it rose to the level of an intent to kill. We concede the fact that appellant sought to revive her by spraying water on her face is somewhat inconsistent with the intent to cause death. However, it is not unreasonable for a jury to conclude that death is a natural and probable consequence of roughly throwing a child to the ground, witnessing the child go into convulsions, and allowing the child to remain unconscious for several hours without seeking medical attention. Indeed, the record indicates that the jury concerned itself with whether appellant's failure to seek aid for Seleana could be considered in determining the mental state of "purpose." During deliberations, the jury asked the court clarify whether "all of [Appellant's] actions or inaction on June 3 4 [, 1997] are to be considered as his intent in his mind." (Emphasis added.)
The evidence indicative of intent does not stop with appellant's conduct on the day of Seleana's death. Rather than report the tragedy to the authorities or to his family, the record shows that appellant lied to family members about Seleana's whereabouts. Further, appellant hid Seleana's body in a crawl space under the house before finally burying the corpse in the backyard inside a plastic garbage can. These surrounding circumstances, which show purposeful efforts to hide Seleana's body and escape detection of her death, are also indicative of intent. See Austin, supra, 52 Ohio App.2d at 68; see, also,State v. Coleman (1988), 37 Ohio St.3d 286, 291 (efforts to escape detection may indicate purpose to kill). Later, when family members were suspicious of Seleana's whereabouts and demanded contact with the child, appellant abruptly fled Ironton with his remaining children without being seen or heard from until his capture in Muskogee, Oklahoma. The totality of these factors and circumstances lead us to conclude that a rational trier of fact could have found that appellant possessed the requisite mental state of "purpose" necessary to be convicted of murder.
Appellant also argues that the trial court should have entered a judgment of acquittal on the murder count because there was insufficient evidence that he caused Seleana's death. Because the autopsy report stated no definitive cause of death, appellant argues no rational trier of fact could have concluded that he killed her. We reject appellant's argument concerning causation because substantial evidence exists from which a reasonable jury could conclude that appellant's acts and omissions killed Seleana.
The prosecution presented expert testimony from Dr. Keith Norton, a forensic pathologist with the Franklin County Coroner's office, concerning the likely cause of death.[3] Dr. Norton testified that Seleana suffered from "diffuse axonal injury," which consisted of damage to nerve cells in the brain that ultimately led to brain swelling. Dr. Norton testified that Seleana likely suffered diffuse axonal injury after appellant threw her to the ground, that the condition was exacerbated by lack of medical attention, and that the resultant swelling ultimately caused her death. Dr. Norton's opinion, in and of itself, was enough to create a factual issue concerning whether appellant's acts and omissions caused Seleana's death. Accordingly, we find that the trial court correctly concluded that a rational jury could have found the essential elements of murder proven beyond a reasonable doubt and correctly overruled appellant's Crim.R. 29(A) motion as to the murder count.
Additionally, the second assignment of error challenges appellant's murder conviction as against the manifest weight of the evidence.[4] This challenge is distinct from one based on sufficiency of the evidence under Crim.R. 29(A). While "sufficient" evidence may exist to overrule a Crim.R. 29(A) motion and allow a case to go to the jury, an appellate court may nevertheless determine that a conviction is against the manifest "weight" of the evidence. State v. Thompkins (1997),78 Ohio St.3d 380, 387. In making a weight of the evidence inquiry, we must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted." State v. Stepp (1997),117 Ohio App.3d 561, 567; see, also, State v. Martin (1983),20 Ohio App.3d 172, 175. In exercising this function, an appellate court sits ostensibly as a "thirteenth juror" and may disagree with the jury's resolution of conflicting testimony.Thompkins, 78 Ohio St.3d at 387. However, the appellate court should exercise its "thirteenth juror" power to grant a new trial " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id. (quoting Martin,20 Ohio App.3d at 175).
We cannot say that the jury "clearly lost its way" in finding appellant guilty of murder. As noted previously, there was substantial evidence in the record indicating that appellant's actions caused Seleana's death. We are satisfied with the jury's conclusion that appellant's act of physical abuse against his stepdaughter and the subsequent failure to obtain medical attention killed Seleana. Moreover, the evidence at trial does not weigh heavily against the jury's conclusion that appellant purposely killed Seleana. Appellant's actions, particularly his failure to seek medical aid and the attempted concealment of Seleana's death, showed a callous disregard for Seleana's life from which we may infer an intent to kill. We cannot dispute the jury's ultimate conclusion that death is a reasonable and probable consequence of the totality of appellant's voluntary acts. The murder conviction was based on sufficient evidence and was not against the manifest weight of the evidence. We therefore overrule appellant's second assignment of error.
Appellant's first assignment of error addresses his Crim.R. 29(A) motion for acquittal on the three counts of kidnapping under R.C. 2905.01(A)(5). The jury found appellant guilty for all three counts, one count for each of the children appellant and Mrs. Volgares took with them when they fled Ohio following Seleana's death. R.C. 2905.01(A)(5) states:
 (A) No person * * * in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
 (5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority.
Appellant contends that, as a matter of law, he could not be guilty of kidnapping under this statute because there was no ongoing "function of government" he could have hindered, impeded, or obstructed at the time he fled Ironton with the children.[5] Appellant concedes that his brother threatened to file a complaint with Children's Services if Seleana was not heard from on August 17, 1997. Appellant also agrees that his sister contacted the Ironton Police Department on August 16, 1997 to present her concerns about Seleana's well-being. Appellant emphasizes, however, that there was neither a formal police investigation nor a Children's Services complaint filed at the time appellant abruptly and stealthily fled Ironton with the three surviving children in the early morning hours of August 17, 1997. A formal police investigation into Seleana's whereabouts did not begin until August 27 and Children's Services was not contacted until August 18. Nevertheless, the trial court overruled appellant's Crim.R. 29(A) motion concerning the kidnapping counts on the basis that an actual, ongoing governmental function is not necessary for an R.C.2901.05(A)(5) conviction. Our de novo review of the statute leads us to the same conclusion.
R.C. 2905.01 expressly defines kidnapping as the act of removing a person from the place he or she is found for "any of the following purposes," which include the purpose to "hinder, impede, or obstruct a function of government." R.C.2905.01(A)(5). The statute does not qualify the phrase "function of government" with "ongoing" or any other adjective. Instead, the statute criminalizes the act of removing a person if the offender has the purpose of hampering a government function through that removal. The statute focuses not on the immediate presence of a government function but, rather, on the offender's purpose of hindering, impeding, or obstructing one, regardless of whether the function is current or prospective. On this point, an analogy argued by the appellee is instructive. Appellee analogizes a situation in which a child witnesses a person committing a crime. The offender then removes the child from the location to prevent the child from reporting the incident. Under appellant's theory, the offender would not be guilty of kidnapping because no investigation was yet underway. We find this interpretation of R.C. 2901.05 to be unsupportable. Appellant warns this court of the grave consequences of upholding a conviction for R.C. 2905.01(A)(5) kidnapping in this case. Appellant argues that any disgruntled relative interested in custody could merely threaten to file a complaint with Children's Services and that any subsequent relocation by the custodial parent would then be a kidnapping under R.C. 2905.01(A)(5). Appellant's argument of such calamitous consequences is unpersuasive, as it fails to appreciate the statute's key element of "purpose." Mere relocation of a child by a custodial parent would not rise to the level of kidnapping absent the requisite purpose of obstructing a government function.
We find further support for rejecting appellant's argument inState v. Powell (1985), 49 Ohio St.3d 255. In Powell, the defendant was convicted of kidnapping under R.C. 2905.01(A)(4). Subdivision (A)(4) of the kidnapping statute prohibits removal of a person with the purpose "[t]o engage in sexual activity * * * against the victim's will * * *." The defendant in Powell
argued that he could not stand convicted of kidnapping because the state failed to prove that he actually engaged in sexual activity with his victim. The Supreme Court rejected this argument, recognizing that "R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of non-consensual sexual activity — not that sexual activity actually take place." Id. at 262 (emphasis added). The court's reasoning applies equally to each of the enumerated "purposes" in R.C. 2905.01, including the provision involved here. R.C.2905.01(A)(5) requires only that appellant removed the three children for the purpose of hindering, impeding, or obstructing a government function — not that any actual government function was in place at the time of removal.
Appellant argues that even if an ongoing investigation is not required, appellant did not "hinder, obstruct, or impede" any government function because the record fails to demonstrate that the remaining children could have provided information helpful to any investigation into Seleana's death. We reject this argument because it also asks us to ignore "purpose" as an element of the offense. Assuming without deciding that the children had no information whatsoever regarding Seleana's death and that any questioning of them would have been futile, appellant could still be guilty of kidnapping if his purpose in taking the children with him was to obstruct, hinder, or impede the authorities' detection of Seleana's fate.
Thus, the key issue in analyzing whether the trial court properly overruled appellant's Crim.R. 29(A) motion concerning the kidnapping counts is whether a rational jury could have found, beyond a reasonable doubt, that appellant took the surviving children away from Ironton with the purpose to hinder, impede, or obstruct a government function. We reiterate that intent is a factual inquiry for the jury and that the jury may infer intent from all of a defendant's actions. Austin,supra, 52 Ohio App.2d at 68. We conclude that the record contains ample evidence to support appellant's conviction. First, the timing and manner of appellant's flight from Ironton supports an inference of the requisite intent. Appellant fled in the middle of the night, just hours after his brother threatened to contact Children's Services regarding Seleana's whereabouts and well-being. The jury could easily conclude that appellant left to avoid detection of Seleana's death and that he took his children with him for that purpose. The record further reveals that appellant and his wife kept traveling about the country, with the intent of reaching Mexico, after authorities discovered Seleana's body. The jury could reasonably conclude that appellant continued to flee with the children in order to avoid consequences for Seleana's death, which included prosecution and loss of custody of the children. Thus, we overrule appellant's second assignment of error.[6]
The fifth assignment of error challenges his conviction for three counts of obstructing justice under R.C. 2921.32(A)(5), arising out of appellant's deliberate misstatements to family members about Seleana's whereabouts. R.C. 2921.32(A)(5) states in relevant part:
 (A) No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime * * * shall do any of the following:
* * *
 (5) Communicate false information to any person. (Emphasis added.)
The jury convicted appellant of lying to family members about Seleana's whereabouts with the purpose of hindering the discovery, apprehension, prosecution, conviction, or punishment of Mrs. Volgares for child endangerment. In arguing that the evidence was insufficient to sustain a conviction for violating R.C. 2921.32(A)(5), appellant asks this court to exercise notions of common sense. Appellant argues that it was appellant alone who shoved Seleana, leading to the girl's death. Thus, any untruths that appellant told to his family were meant to protect him and not his wife. Appellant challenges the allegedly illogical conclusion that appellant would engage in the "gracious behavior" of lying to protect his wife from a fifth degree felony when he is potentially guilty of murder.
We are unpersuaded by appellant's view of the record and conclude that the trial court correctly denied appellant's Crim.R. 29(A) motion concerning the obstructing justice counts. Appellant acknowledges that he lied to his family about Seleana's whereabouts in order to protect himself. However, the jury could reasonably conclude that appellant sought to protectboth Mrs. Volgares and himself. The record shows that Mrs. Volgares played an active part in helping conceal Seleana's body following the child's death and that she also failed to seek medical attention for Seleana after the child became unconscious. The record also reveals that Mrs. Volgares accompanied appellant when they fled Ironton with the remaining children. Even though appellant undoubtedly knew of his own potential culpability, there was ample reason for the jury to conclude that appellant also knew that Mrs. Volgares could be potentially guilty of serious crimes for her part in this tragedy. While appellant's desire to protect himself provided strong motivation to lie, a jury could also infer a purpose to protect Mrs. Volgares from all of these circumstances. An inference that appellant lied at least in part to protect his wife is reasonable and not so illogical as to justify sustaining appellant's Crim.R. 29(A) motion. Cf. State v.Ratajczak (Sept. 2, 1992), Lorain App. No. 91CA005256, unreported (despite defendant's claim of fear as motivator for misstatement, jury could infer purpose from surrounding circumstances). We therefore overrule appellant's fifth assignment of error.
 III.
In his third assignment of error, appellant challenges the trial court's imposition of consecutive sentences. Appellant argues that the trial court inappropriately sentenced him to consecutive terms without making the necessary findings compelled by R.C. 2929.14(E)(4). The trial court imposed consecutive sentences on appellant totaling thirty-seven years to life imprisonment and expressly declared that it had "considered" the various factors enumerated in R.C.2929.14(E)(4).[7] Notwithstanding the trial court's express consideration of the relevant factors, appellant contends that "consideration" is not enough. We reluctantly agree.
In order to modify or reduce a sentence, a reviewing court must find by clear and convincing evidence that the sentence is either unsupported by the record or, alternatively, contrary to law. R.C. 2953.08(G)(a) and (d). "Clear and convincing evidence" is a measure of proof that: (1) is greater than a "preponderance of the evidence;" (2) is less than "beyond a reasonable doubt;" and (3) produces a firm belief as to the facts sought to be established. State v. Schiebel (1990),55 Ohio St.3d 71, 74. Thus, if the trial court did not properly follow the dictates of R.C. 2929.14(E)(4) in imposing consecutive sentences, we must set appellant's sentence aside and order the trial court to resentence him in accordance with statute.
A trial court must give its reasons for imposing consecutive sentences. State v. Holsinger (Nov. 20, 1998), Pike App. No. 97CA605, unreported. R.C. 2929.14(E)(4) states:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:[8]
* * *
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
* * *
At appellant's sentencing hearing, the trial court specifically mentioned that it had "considered" the R.C.2929.14(E)(4) factors in deciding whether appellant should serve his sentences concurrently or consecutively:
 Further, in determining whether the sentences shall be concurrent or consecutive, I have considered whether consecutive terms are necessary to protect the public and punish the offender, whether or not they are disproportionate to the conduct of the defendant and to the danger the offender poses, and whether the harm is so great or unusual that a single term does not adequately reflect the seriousness of the conduct.
The record therefore establishes that the trial court attempted to comply with the sentencing guidelines contained in R.C. 2929.14(E)(4)(b) in imposing consecutive terms for appellant's multiple offenses.
Prior to the Ohio legislature's enactment of Senate Bill 2, which took effect on July 1, 1996 and revamped this state's felony sentencing law, trial courts were not required to explain their findings nor their reasons for imposing a particular sentence on a convicted defendant. See State v.Brown (1984),12 Ohio St.3d 147, 151. However, with the advent of Senate Bill 2, trial courts must now be more detailed in justifying their selection of a particular sentence, as well as their decision to impose consecutive prison terms for multiple offenses. While Senate Bill 2 continues to allow trial courts to exercise discretion in sentencing, the discretion is circumscribed by statutory factors the trial courts must consider.Holsinger, supra. Thus, it is no longer enough for a trial court to declare that it "considered" the mandated statutory criteria. "Whereas the prior version [of Ohio sentencing law] left the decision to the discretion of the trial judge, the statute now provides that the court may impose consecutive sentences 'if the court finds' certain circumstances to exist."State v. Kase (Sept. 25, 1998), Ashtabula App. No. 97-A-0083, unreported. Sentencing courts must now make the findings contained in R.C. 2929.14(E)(4). See Id.; see, also, R.C.2929.19(B)(2)(c) (at sentencing hearing, court shall state itsreasons for imposing consecutive sentence under R.C. 2929.14).
The trial court specifically noted that it had "considered" the various factors enumerated in R.C. 2929.14(E)(4)(b). However, the record does not reveal specific factual findings concerning these "considered" factors. The record suggests that the trial court attempted to comply with statutory sentencing factors contained in R.C. 2929.12 and 2929.13 by making specific findings aimed at establishing the propriety of the sentence. Among these specific findings were: (1) Seleana's injuries were exacerbated by her age and physical condition and that she suffered serious physical harm; (2) appellant's relationship to Seleana facilitated the offense committed; (3) appellant had displayed no genuine remorse for the crimes; (4) the continuous sequence of events made the crimes serious and that there were no factors to make the crimes less serious; (5) a non-prison sanction would not adequately protect the public or punish appellant and would demean the seriousness of the offense committed; and (6) appellant committed the worst form of the offense in all circumstances. While these specific findings constitute a laundry list of factors to justify the prison terms chosen by the trial court, none qualifies as a specific finding in support of consecutive sentencing. R.C.2929.14(E)(4) provides narrow and exclusive factors on which the trial court needed to make findings on the record before it imposed consecutive sentences on appellant. State v. Stanley
(Oct. 27, 1998), Meigs App. No. 97CA21, unreported; see, also,State v. Johnson (Oct. 23, 1998), Hamilton App. No. C-980013, unreported (re-sentencing necessary when record fails to reflect predicate factors of R.C. 2929.14(E)(4)); State v. Hall
(Aug. 21, 1998), Erie App. No. E-97-121, unreported (express findings with regard to R.C. 2929.14(E)(4) factors required prior to imposition of consecutive sentences); State v. Church
(Aug. 28, 1998), Licking App. No. 98CA34 (re-sentencing appropriate when trial court did not make specific finding with regard to whether any of the factors contained in R.C.2929.14(E)(4)(a) — (c) were present); State v. Albert (Nov. 13, 1997), Cuyahoga App. No. 72677, unreported (remanding to trial court for specific finding mandated by statute). The trial court's asserted "consideration" of factors is not enough. The record "must contain some indication, by use of specificoperative facts, that the court considered the statutory factors in its determination." Kase, supra (emphasis added); see, also, Griffin Katz, Ohio Felony Sentencing Law (1998) 19-20, 465. The record in this case contains no such indication and we therefore sustain appellant's third assignment of error. On remand, the trial court must make specific factual findings on the record with respect to the R.C. 2929.14(E)(4) factors if it seeks to impose consecutive prison terms.
 IV.
In his fourth assignment of error, appellant challenges the imposition of consecutive sentences for murder and child endangering. Appellant contends that consecutive sentencing for these offenses, even if the court makes the necessary statutory findings, violates constitutional and statutory proscriptions of multiple punishments for the same offense. We conduct ade novo review of these issues.
The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect against multiple punishments being imposed upon an accused for the same offense. See North Carolina v.Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656;State v. Thomas (1980), 61 Ohio St.2d 254, 259-60, overruled on other grounds in State v. Crago (1990), 53 Ohio St.3d 243. Moreover, R.C. 2941.25, the "multiple-count statute," codifies Double Jeopardy principles by prohibiting multiple punishments for the same criminal conduct in violation of the state and federal constitutions. Thomas, 61 Ohio St.2d at 260; State v.Moore (1996), 110 Ohio App.3d 649, 653.
R.C. 2941.25 provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
Appellant contends that the trial court impermissibly sentenced him to consecutive terms for murder and endangering children because those two crimes are allied offenses of similar import within the meaning of R.C. 2941.25.
The Ohio Supreme Court has created a two-tiered test for determining whether two crimes are allied offenses of similar import. Newark v. Vazirani (1990), 48 Ohio St.3d 81, syllabus. First, we compare the elements of the two crimes. If the elements "correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must proceed to the second step." Id. at 83 (quoting State v.Blankenship (1988), 38 Ohio St.3d 116, 117). In the second step, we review the defendant's conduct to determine whether he can be convicted of both offenses. Id. "If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted for both offenses." Id. (quoting Blankenship). If analysis of the first step results in a conclusion that the crimes are not allied, the court need not proceed to the second step "and the defendant may be charged with, found guilty of, and sentenced for both offenses." State v. Barton (1991),71 Ohio App.3d 455, 462.
In analyzing the elements of these two offenses, we turn to the relevant statutes. R.C. 2903.02 defines murder as "purposely caus[ing] the death of another * * *." R.C.2919.22(A), the endangering children statute for which appellant was convicted, provides in part:
 (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.
In comparing the elements of these two offenses, we conclude that the offenses are not allied. We are compelled to this conclusion by the Ohio Supreme Court's decision in State v.Richey (1992), 64 Ohio St.3d 353. In Richey, the Supreme Court addressed whether child endangering under R.C. 2919.22(A) and aggravated murder were allied offenses of similar import and concluded they were not:
 The elements of child endangering are the defendant's custody or control of a child under eighteen and his creation of substantial risk to the health or safety of the child by violating a duty of care or protection. Aggravated murder is a purposeful killing in the course of one of nine specified felonies, none of which is child endangering. These offenses have entirely different elements.
Id. at 369.
Although Richey dealt with aggravated murder, there is no meaningful distinction that would allow us to depart from the Supreme Court's reasoning. See State v. Doan (Sept. 29, 1995), Hamilton App. No. C-940330, unreported (following Richey in a case involving non-aggravated murder). Murder under R.C. 2903-02, defined as the purposeful killing of another, still has entirely different elements from child endangering under R.C. 2919.22(A). Moreover, we cannot conclude that the offenses correspond to such a degree that the commission of one will result in commission of the other. The offense of endangering children under R.C. 2919.22(A) is complete as soon as the defendant commits an act that creates a substantial risk to the health and safety of a child. In addition, the culpable mental state for the offense of endangering children is recklessness.Barton, supra, 71 Ohio App.3d at 462, fn. 1. The offense of murder, however, requires a purposeful killing of another person and does not require a child victim. Proof of purposefulness may also satisfy recklessness, but proof of recklessness is not sufficient to prove purpose. Id. at 464. Murder and felony child endangering are therefore dissimilar offenses because a person can commit one without committing the other. Cf. Statev. Buckta (Nov. 12, 1996), Pickaway App. No. 96 CA 3, unreported (holding involuntary manslaughter and felony child endangering to be dissimilar offenses); Barton,71 Ohio App.3d at 462-64 (holding that felony child endangering and felonious assault are not allied offenses). In addition, in enacting R.C.2919.22, the Ohio legislature has chosen to bestow special protection to children. State v. Anderson (1984), 16 Ohio App.3d 251,254. Because the peculiar elements at the heart of the crime of child endangering under R.C. 2919.22(A) — the existence of a child victim in an offender's custody and control — play no essential part in the definition of murder, it is evident that an act of murder will not "perforce" result in an act of felony child endangering. See Id.; Barton, 71 Ohio App. 3
d at 464.
Appellant's argument that child endangering and murder are allied offenses of similar import is based largely on the logical notion that a defendant who purposely causes the death of a child victim necessarily endangers the child in violation of R.C. 2919.22. Even though the statutory offenses may be distinct, appellant asks us to recognize that the conduct punished under each offense is not, making the offenses allied. Although we reject appellant's argument, we are mindful of authority sympathetic to appellant's viewpoint. Some opinions suggest that a straight "comparison of the elements" formulation is not the proper way to determine whether offenses are allied; rather, the appropriate analysis may be whether the nature of the elements is such that in some instances the offenses may overlap. See Blankenship, supra,38 Ohio St.3d at 119 (Whiteside, J., concurring). According to this view, "[t]he elements of each crime should not be analyzed in a vacuum, but should be considered with the facts in the particular case."State v. Johnson (May 1, 1998), Hamilton App. No. C-970180, unreported, discretionary appeal denied, 82 Ohio St.3d 1481; see, also, State v. Lang (1995), 102 Ohio App.3d 243, 249-50. Accordingly, in Johnson, the court found involuntary manslaughter and child endangering to be allied, for the simple reason that [t]he fundament for both of these offenses was the blow that killed [victim]." Johnson. Thus, the Johnson court decided, multiple punishments for each offense would constitute multiple punishments for but a single act. In the Johnson
court's view, this was contrary to R.C. 2941.25. See, also,State v. Brown (1982), 7 Ohio App.3d 113, 116-17 (R.C.2941.25(A) is designed to prohibit duplication of punishment where crimes are based on identical purpose and conduct). Nevertheless, despite any logic inherent in this view of R.C.2941.25, we are bound by the holding of Richey, which guides us to the inescapable conclusion that murder and endangering children are not allied offenses, despite the apparent imposition of consecutive sentences (i.e., multiple punishments) for the same conduct of appellant. Any clarification of whether a strict "comparison of the elements" test is the proper method of determining whether murder and endangering children are allied offenses is left to the Supreme Court. See Johnson at fn. 14.
In addition to his statutory challenge under R.C. 2941.25, appellant also argues that the consecutive sentences for endangering children and murder are barred by the double jeopardy provisions of the state and federal constitutions. We reject this argument as well.
In determining whether punishment pursuant to separate statutory provisions is permissible under the double jeopardy clause, courts generally follow the "Blockburger" test devised by the U.S. Supreme Court. Blockburger v. United States (1932),284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306. The test requires us to ask whether each offense requires proof of an element that the other offense does not. Id. If the answer is yes, the offenses are separately punishable without running afoul of the Double Jeopardy Clause. Applying the Blockburger
test in this case reveals no double jeopardy problem. Sentencing for child endangering and murder satisfies the test because each offense requires proof of additional elements. For example, murder requires proof that an offender purposely caused the death of another, an element which is not required for child endangering. Additionally, child endangering under R.C. 2919.22(A) requires proof that the offender had one of the statutorily defined relationships to the victim and that the victim was a child, none of which are elements of murder. Because the consecutive sentences are constitutionally and statutorily proper, we overrule appellant's fourth assignment of error.
 V.
Appellant's sixth assignment of error addresses the trial court's admission of Dr. Norton's expert opinion testimony concerning the cause of Seleana's death. Appellant raises two distinct issues relating to this assignment of error. First, appellant contends that the trial court should have excluded the opinion because the doctor's testimony violated the prosecution's continuing duty to disclose discoverable materials under Crim.R. 16(D). Second, appellant contends that the opinion was improper under Evid.R. 703. We review most evidentiary issues under an abuse of discretion standard of review. State v. Sage (1987), 31 Ohio St.3d 137, paragraph two of the syllabus.
Dr. Norton, the Franklin County Deputy Coroner, testified regarding his autopsy of Seleana's body. The prosecution qualified Dr. Norton as an expert in the area of forensic pathology. During pre-trial discovery, appellee disclosed that it would call Dr. Norton as a witness and also produced the autopsy report from Dr. Norton's examination of the body. The report stated the final diagnosis as: "No anatomical cause of death, advanced post-mortem decomposition." At trial, Dr. Norton testified that the autopsy could not determine a definitive cause of death, in large part, due to the advanced decomposition of the body at the time authorities found it buried in appellant's yard. However, Dr. Norton testified that he could rule out a number of potential causes of death from the autopsy, including disease or bone fractures. Having ruled out certain causes of death, Dr. Norton also gave testimony concerning the likely cause of death in response to a hypothetical presented by the prosecutor:
 Q. [by Prosecutor Collier] Doctor, [in] the next question I want you to assume certain facts to be true. Assume that Seleana Gamble was twisted and shoved down a hallway approximately six and a half (6 1/2) feet from where she was standing to where her head landed. Assume that when she landed she went into convulsions. Assume that once she landed she never regained consciousness, and assume that she continued to survive for approximately twelve (12) hours. Assume all that to be true, and based on the autopsy that you performed on Seleana Gamble, do you have an opinion as to the likely cause of death?
* * *
 A. The most likely cause of death, based on my, on everything here, my autopsy for instance, ruling out bleeding inside of the skull, and then also the history of being violently turned and thrown or pushed, with falling, this would all go along, and then seizures afterward, would go along with what is called "diffuse axonal injury".
Dr. Norton then described diffuse axonal injury and its likely effect on Seleana after appellant threw her to the floor and his subsequent failure to seek medical aid.
In his first argument, appellant takes issue with Dr. Norton's testimony because of its "material change" from the contents of the autopsy report that the prosecutor had previously disclosed to defense counsel. Appellant argues that Crim.R. 16(D) imposes a continuing duty to disclose discoverable material and that Dr. Norton's change in testimony fell under this obligation. During trial, Dr. Norton acknowledged that he formulated his opinion five days prior to his testimony (three days prior to trial) when the prosecutor presented him with additional facts upon which to base it. Appellant asserts that if he had known of Dr. Norton's testimony, he could have secured his own expert to testify concerning Seleana's cause of death.
Appellant's argument for exclusion of Dr. Norton's testimony amounts to a request for a Crim.R. 16(E)(3) sanction for a failure to comply with Crim.R. 16(D). Prosecutorial violations of Crim.R. 16 are reversible only where an appellant shows that: (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefitted the accused in preparing a defense, and (3) the accused suffered prejudice. State v. Joseph (1995),73 Ohio St.3d 450, 458. A trial court possesses a certain amount of discretion in determining the appropriate sanction for an alleged Crim.R. 16(D) violation. State v. Parson (1983), 6 Ohio St.3d 442,445. The court may, but does not have to, exclude the prosecution's evidence. Id.
Crim.R. 16(D) imposes a continuing duty on all parties to disclose discoverable materials that become available.[9] Thus, in order to ascertain whether the prosecution violated Crim.R. 16(D), we must analyze whether Dr. Norton's testimony was discoverable prior to trial. Crim.R. 16(B)(1) governs what materials the prosecuting attorney must disclose to the defense upon motion of the defendant. Specifically, Crim.R. 16(B)(1)(d) provides:
 (d) Reports of examinations and tests. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, or copies thereof, available to or within the possession, custody or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney.
We hold that the trial court properly admitted Dr. Norton's opinion because his testimony did not fall within the continuing duty to disclose imposed by Crim.R. 16(D). Crim.R. 16(B)(1)(d) requires disclosure only of reports and tests. Dr. Norton's opinion was neither. Rather, Dr. Norton's opinion was based on additional facts which the prosecutor established at trial. Appellant's briefing gives no guidance as to why Dr. Norton's opinion was discoverable prior to trial, except to argue that it constituted a "material change" from his autopsy report. We can only surmise that appellant contends Dr. Norton's opinion is "the result or report" of some examination. The only relevant report or test conducted by Dr. Norton — the autopsy report — had already been provided to the defense. Crim.R. 16(B)(1)(e) requires the disclosure of potential witness names, not the substance of their testimony.
We considered a similar situation in State v. Mullen (Aug. 12, 1994), Meigs App. No. 93CA518, unreported. In Mullen, the defendant challenged a conviction for corrupting minors by providing drugs. At trial, the state presented expert testimony from a toxicologist. The toxicologist testified regarding the results of tests he performed to determine the amount of a certain drug in the victims' bloodstream. The defendant claimed that the prosecution breached its continuing duty under Crim.R. 16(D) by failing to disclose the expert's testimony prior to trial. This court disagreed, noting that the toxicologist's testimony was basically the result of mathematical calculations using figures contained in a lab report. Cf. State v. Goble
(1982), 5 Ohio App.3d 197, 198 (investigator's testimony based on common sense and investigative work was not a discoverable "experiment" within meaning of Crim.R. 16(B)(1)(d)). Just as inMullen, the appellant here cites no authority for the proposition that the opinion testimony fell within the contours of Crim.R. 16(B)(1)(d). We find no significant difference between the admissibility of the toxicologist's testimony inMullen and Dr. Norton's testimony at appellant's trial. Dr. Norton came to a conclusion regarding the cause of death using facts which were established at trial, and the autopsy he performed on Seleana. Moreover, we fail to see how Dr. Norton's purported "material change" in testimony should have been a surprise to the defense. Dr. Norton performed the autopsy and was disclosed to the defense as a witness, giving ample notice that he might testify to a cause of death in less than terms of certainty. See, e.g., State v. Heinish (1990), 50 Ohio St.3d 231,235 (coroner may testify to possible cause of death). The defense could have deflected any surprise by asking for a continuance, but did not do so. Further, appellant's counsel had the opportunity to cross-examine Dr. Norton regarding his opinion. Where an expert's trial testimony purportedly varies from a prior report, the opposing party is free to impeach the witness with the prior inconsistent statement. See Evid.R. 613 and Mullen, supra (defendant had opportunity to cross-examine and did not request continuance).
In the second argument under this assignment of error, appellant contends that Dr. Norton's testimony regarding the likely cause of Seleana's death was inadmissible because it violated Evid.R. 703. Appellant cites the doctor's testimony as being based upon a "history of being violently thrown" while the prosecutor's hypothetical only asked Dr. Norton to base his opinion on Seleana having been "twisted and shoved."
Admission or exclusion of expert testimony is generally a matter committed to the sound discretion of the trial court.State v. Sage, supra. The trial court's discretion, however, must be guided by the standards of Evid.R. 703, which governs what an expert may rely on in rendering an opinion. Under Evid.R. 703, the facts upon which an expert relies must be either perceived by the expert or admitted in evidence at trial. State v. Jones (1984), 9 Ohio St.3d 123, syllabus. In the present case, appellant argues that there was no evidence that he "violently turned" Seleana and that, therefore, Evid.R. 703 barred his opinion. We disagree with appellant's focus on semantics over substance.
Dr. Norton rendered his opinion using facts contained in the prosecutor's hypothetical. An expert may render an opinion based on a hypothetical question so long as sufficient testimony regarding the facts of the hypothetical have been introduced at trial. Price v. Daughterty (1982), 5 Ohio App.3d 157,160. There must be an evidentiary basis for the jury to determine whether the facts contained in the hypothetical have been established at trial. Id. There was sufficient testimonial evidence in the record to support the factual basis of Dr. Norton's opinion that Seleana was "violently turned or thrown". Prior to Dr. Norton testifying at trial, the prosecution offered testimony from Det. Sargent, who investigated the case and questioned appellant following appellant's arrest. Det. Sargent testified that appellant had re-enacted the incident with Seleana using a mannequin, wherein appellant described his pushing Seleana "very, very hard" to the point where her body rotated and fell to the ground seven or eight feet away. There is no significant difference between describing the action as a "violent turn" and the action being done "very, very hard."
Appellant also takes issue with Dr. Norton's description of Seleana being "thrown" rather than being "twisted and shoved down a hallway," as the prosecutor presented the hypothetical. We find nothing wrong with Dr. Norton's use of, or reliance on, the word "thrown" in describing appellant's act of shoving Seleana. The jury heard several different descriptions of appellant's abuse of Seleana. Statements and testimony admitted by the trial court described the action in such varied terms as "shoved," "pushed," and even "tossed." Thus, the expert's use of the word "thrown" is of negligible difference. To the extent any discrepancy exists between the facts on which Dr. Norton's testimony relied and the facts admitted into evidence, the discrepancies are not substantial and would impact the weight of his testimony, not its admissibility. See State v. English
(1991), 77 Ohio App.3d 371, 385. If defense counsel believed the discrepancies to be significant to appellant's defense, cross-examination was available to explore the differences.
Moreover, the record shows that the trial court properly instructed the jury in order to ameliorate any effect of the discrepancy between the facts relied upon by Dr. Norton and the evidence adduced at trial. The jury instructions included a charge that read:
 Questions have been asked in which expert witnesses were permitted to assume that certain facts were true and to give an opinion based on such assumption. You must determine whether the assumed facts, upon which the expert based their [sic] opinion are true. If any assumed fact was not established, you will determine its effect upon the opinion of the experts.
See Price, supra, 5 Ohio App.3d at 160 (noting that court should instruct jury in this fashion in addition to determining whether some evidence exists to support facts in hypothetical). In light of this instruction, the evidence present in the record, and the lack of any substantial discrepancy between the facts Dr. Norton relied upon and the facts presented at trial, we find no abuse of discretion in the trial court's admission of the expert opinion. Therefore, we overrule appellant's sixth assignment of error.
 VI.
In his seventh and eighth assignments of error, appellant alleges that he received ineffective assistance of counsel during trial.[10] The Sixth Amendment to the United States Constitution grants criminal defendants the right to the effective assistance of counsel during trial. See McMann v.Richardson (1970), 397 U.S. 759, 771 fn. 14, 90 S.Ct. 1441, L.Ed.2d 763. In determining whether a criminal defendant received ineffective assistance of counsel at trial, we undergo a two-pronged analysis developed in Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the convicted defendant must demonstrate that counsel's performance was deficient, which "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. Second, the convicted defendant must also demonstrate that the deficient performance prejudiced his defense. Id. This second prong must include a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.; Lockhart v. Fretwell
(1993), 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180.
A convicted defendant has the burden of establishing both prongs before a reviewing court will deem trial counsel's performance ineffective. Strickland, 466 U.S. at 687. Moreover, in scrutinizing trial counsel's performance, a reviewing court must be highly deferential and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see, also,State v. Smith (1985), 17 Ohio St.3d 98, 100. Even though a convicted defendant may take issue with many of his counsel's choices and strategies during trial, such Monday morning quarterbacking is inevitable after an unfavorable result. "A fair assessment of attorney performance requires us to eliminate the distorting effect of hindsight." State v. Post
(1987), 32 Ohio St.3d 380, 388. The defendant must overcome a presumption that his counsel's actions or inactions "might be considered sound trial strategy." Strickland, 466 U.S. at 689; see, also, State v. Frazier (1991), 61 Ohio St.3d 247, 253-55.
Appellant's first claim of ineffective assistance addresses trial counsel's failure to call any defense witnesses. Generally, an attorney's choice of what witnesses to call and what witnesses not to call falls within the realm of trial strategy. State v. Hunt (1984), 20 Ohio App.3d 310, 312. Moreover, the mere failure to subpoena witnesses does not render counsel's assistance ineffective absent a showing of prejudice. State v. Coulter (1992), 75 Ohio App.3d 219, 230. The decision by counsel not to call a single witness was not devoid of tactical reason. With many of the pertinent facts apparently being undisputable, the defense strategy appeared to be geared at contesting whether the prosecution's evidence fit certain elements of the various offenses. Defense counsel reasonably relied upon cross-examination of the state's witnesses to accomplish this strategy. Further, the record does not offer any possibilities as to whom his counsel could have called and what testimony would have been adduced that would have significantly changed the course of his trial. Thus, appellant has established neither prong of the Strickland test based on his counsel's failure to call a witness.
Appellant next contends that his counsel should have called for an independent autopsy. However, appellant makes no argument as to how this failure rendered counsel's performance deficient. The existing autopsy noted that the Franklin County Coroner could not determine a definitive cause of death. This report thus appears to be favorable for the defense and a strategy geared toward relying on it cannot be deemed deficient. This allegation of ineffective assistance also fails.
Appellant's third argument alleges that his trial counsel failed to meet with him for an "adequate" amount of time prior to trial. If trial counsel had done so, appellant argues, he would have learned that Seleana's death could have been caused by a fall from a swingset the day before. This argument is also unavailing for a number of reasons. First, appellant fails to enlighten this court on what he means by an "adequate amount of time." Neither the briefs nor the record help us in evaluating what amount of time trial counsel spent with appellant prior to trial. We cannot determine whether an attorney was ineffective when the allegation of ineffectiveness is based on facts outside the record. State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of syllabus. Further, with no indication as to what appellant means by his nebulous assertion of an "adequate amount of time," appellant cannot overcome the presumption that counsel rendered adequate assistance. Moreover, appellant fails to show that his counsel's failure to spend an "adequate amount of time" with him prejudiced the defense at trial. Although appellant maintains that trial counsel "would have learned" about Seleana's falling off a swingset the day before her death, this speculation rings hollow. Appellant gave at least two statements to police in which he could have revealed this "fact." Furthermore, he sat at a five-day trial during which he could have revealed this "fact" to his counsel. Appellant does not convince us that trial counsel's spending an "adequate amount of time" with him prior to trial, whatever that may mean, would have revealed this "fact." Cf. Bradley, supra,42 Ohio St. 3d at 146 (counsel's alleged failure to conduct adequate pre-trial investigation did not constitute ineffective assistance).
The fourth alleged instance of ineffective assistance arises out of trial counsel's failure to suppress the statement appellant gave to Det. Sargent after his arrest in Muskogee, Oklahoma. During Det. Sargent's direct examination, the prosecution played appellant's taped statement and distributed copies of the statement's transcript to the jury. Appellant concedes that he waived his constitutional rights to counsel and to remain silent during that statement and answered affirmatively to Det. Sargent's inquiries as to whether appellant gave the statement voluntarily. Nevertheless, appellant now claims that immediately prior to the statement, he requested an attorney and was told that if he exercised those rights, "nobody could help him." Based on this purported invocation of his right to counsel prior to his custodial interrogation, appellant argues that trial counsel should have attempted to "suppress the statement."
Appellant's trial counsel neither filed a motion to suppress nor objected to the introduction of the statement at trial. It is plausible that the admission of the statement may have been reasonably related to trial counsel's strategy. It appears from the record that appellant's trial counsel sought to concede many of the facts and circumstances established by the prosecution. Instead of a complete acquittal, it appears that trial counsel attempted to secure acquittal for the more serious offenses, such as the murder count, while arguing that the state's evidence established only lesser offenses. Consistently with this apparent strategy, appellant pled guilty to the endangering children, tampering with evidence, and abuse of a corpse counts alleged in the indictment. Thus, trial counsel may have made the calculated decision to admit appellant's statement in order to use it as part of the defense. Indeed, trial counsel emphasized appellant's statement in cross-examining Det. Sargent and referred to it in closing argument to establish appellant's cooperation with law enforcement and the consistency of his story with the other evidence presented. We cannot say that trial counsel's decision not to suppress the statement rendered his performance deficient.
Additionally, it does not appear that appellant's counsel could have suppressed the statement even had he tried. Counsel does not render ineffective assistance in failing to move to suppress evidence when there is no basis upon which to succeed. See State v. Mills (1992), 62 Ohio St.3d 357, 370. If a statement appears voluntary and consistent with the evidence, trial counsel could justifiably decide that efforts to suppress would be futile. See State v. Flors (1987), 38 Ohio App.3d 133,139; State v. Martin (1983), 20 Ohio App.3d 172, 174. In this case, we find no basis upon which appellant's trial counsel could have excluded appellant's statement, whether by way of motion or objection at trial. The record reveals no evidence that Det. Sargent or any other law enforcement officer used duress, threats, or promises to obtain appellant's statement in Oklahoma. Moreover, the statement itself reveals that appellant was advised of his rights and willingly chose to give his statement and cooperate with police. See Flors,38 Ohio App.3d at 139. Appellant's new assertions that he was somehow denied his right to counsel when making his statement are outside the record, making it impossible for us to determine if counsel was ineffective in not attempting to suppress it. State v. Gibson
(1980), 69 Ohio App.2d 91, 95.
In his fifth instance of alleged ineffectiveness of trial counsel, appellant takes issue with Dr. Norton's testimony that appellant's failure to seek medical aid exacerbated Seleana's injuries. Dr. Norton testified that Seleana "would've had a better chance [of survival] if she had been treated quickly." Prior to giving his opinion regarding Seleana's "better chance" at survival, Dr. Norton had testified that diffuse axonal injury was the likely cause of death. Appellant characterizes the "better chance" opinion as being based on the prior cause of death opinion and therefore improper because it was not based on "evidence" as required by Evid.R. 703. Appellant's argument implies that Dr. Norton's testimony constituted the stacking of one inference (the "better chance" opinion) upon another inference (the cause of death opinion). This so-called stacking of an inference upon another inference is not permitted under Ohio law. See Motorists Mut. Ins. Co. v.Hamilton Twp. (1986), 28 Ohio St.3d 13, syllabus. This argument, however, is meritless.
The rule against stacking inferences prohibits only the drawing of one inference solely and entirely from another inference. Donaldson v. N. Trading Co. (1992), 82 Ohio App.3d 476,481 (citing Hurt v. Charles J. Rogers Transp. Co. (1955),164 Ohio St. 329, paragraph one of syllabus). The rule does not prevent parallel inferences in combination with additional facts or drawing multiple inferences separately from the same set of facts. Id. Further, even an ultimate conclusion may be drawn from a series of inferences, so long as no inference is based solely and entirely on another inference. Id. at 482. The two relevant inferences concerning Dr. Norton's testimony are: (1) diffuse axonal injury was the cause of death and (2) the victim would have had a better chance of survival had she received medical attention.
Contrary to appellant's assertions, the second inference that Seleana would have had a "better chance" at survival is not based solely on the first inference regarding the cause of death. The first inference is based on the hypothetical question posed to Dr. Norton. The second inference is based on the first one, plus the additional fact that Seleana received no medical attention. Thus, rather than being a prohibited stacking of an inference, the "better chance" opinion is more appropriately construed as a parallel inference based on an additional fact. Id. at 481.
Moreover, the record reveals that the prosecutor's hypothetical to Dr. Norton included the fact that Seleana did not receive medical attention for several hours following the initial injury. Thus, we may characterize the "better chance" opinion as being subsumed into the opinion regarding diffuse axonal injury as the cause of death. Dr. Norton's opinion may be read as stating that the lack of medical attention in combination with the onset of diffuse axonal injury, resulting from appellant's act of twisting and shoving Seleana, was the cause of death. Viewing the testimony in this light, there has been no stacking of inferences whatsoever. The opinion was admissible and the failure of appellant's trial counsel to object to it did not constitute ineffective assistance.
Appellant's final argument that his trial counsel was ineffective is based on the prosecution's display in court of the garbage can in which appellant buried Seleana. Appellant did not contest either Seleana's death or the fact that he buried her in the trash can. Therefore, appellant argues, the trash can was irrelevant pursuant to Evid.R. 403 and the prosecutor used it only to "enflame the jury" by allowing jurors to smell the strong odor emanating from it. Indeed, appellant points out that the prosecution did not offer the trash can as evidence, merely displaying the can and offering photographs of it as evidence. Appellant concludes that his trial counsel was ineffective for failing to object to this display. Although we acknowledge that the trash can's display may have had some effect on the jury's sensibilities, we also doubt that but for the display, appellant would have been acquitted. Even assuming counsel made an objection and it was sustained, there was no reasonable probability of changing the outcome of the trial. Nonetheless, counsel for the appellee would be well advised to avoid similar strategies in the future.
In sum, we find no support for any of appellant's assertions of ineffective assistance of counsel at trial. In none of the alleged instances of ineffectiveness has appellant satisfied both prongs of the Strickland test. Accordingly, we overrule appellant's seventh and eighth assignments of error.
 VII.
The judgment of the Lawrence County Court of Common Pleas is affirmed in all respects with the exception of its sentencing of appellant to consecutive terms of imprisonment. We vacate only that part of the trial court's judgment entering consecutive sentences and remand to the trial court for re-sentencing in accordance with R.C. 2929.14(E)(4) and consistent with this opinion.
JUDGMENT AFFIRMED IN PART, VACATED IN PART AND REMANDED.
[1] Crim.R. 29(A) states:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
[2] R.C. 2901.22(A) states:
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
[3] Appellant challenges the propriety of this opinion under his sixth assignment of error, which we analyze fully infra.
[4] Appellant raised his "manifest weight of the evidence" claim within his second assignment of error, but did not separately argue the point in his brief. Appellant's briefing is devoted exclusively to the Crim.R. 29(A) sufficiency of the evidence argument. A court of appeals may ignore errors that an appellant fails to assign and argue. App. R. 12(A); Hawley v.Ritley (1988), 35 Ohio St.3d 157, 159; see, also, State v.Moore (1994), 97 Ohio App.3d 137, 149. In the interests of justice, however, we have chosen to address appellant's "manifest weight of the evidence" issue.
[5] R.C. 2905.01 also prohibits the removal of another for the purpose "[t]o facilitate the commission of any felony or flight thereafter." R.C. 2905.01(A)(2). The indictment, however, charged appellant only with kidnapping pursuant to R.C.2905.01-(A)(5). The record does not indicate that the prosecution attempted to utilize R.C. 2905.01(A)(2).
[6] The dissent argues that an affirmance of the appellant's kidnapping conviction creates a bad precedent, "far beyond what the legislature intended." The dissent contends that affirming the appellant's kidnapping conviction results in an unconstitutional construction of R.C. 2905.01(A)(5) that may criminalize legitimate exercise of parental rights. However, the appellant raises no constitutional challenge to R.C.2905.01(A)(5) and concedes that the kidnapping statute contains no exception for custodial parents. The appellant argues only that R.C. 2905.01(A)(5) requires the impeding of an "ongoing" government function. The dissent's concern about an overbroad interpretation of R.C. 2905.01(A)(5) impinging upon parental rights is not before us on this appeal. For a discussion of the dissent's constitutional concerns with R.C. 2905.01(A)(5)'s application to custodial parents, see State v. Mona Volgares, Lawrence App. No. 98CA1, unreported.
[7] R.C. 2929.14(E)(4), setting forth the factors the trial court considers in imposing consecutive sentences, was in effect at the time of appellant's sentencing. This section was codified at R.C. 2929.14(E)(3) at the time appellant committed the crimes for which he was convicted. The legislature's re-enactment of this provision as R.C. 2929.14(E)(4) utilized the same wording, changing only the numbering of the statute. Our analysis would be the same under either current R.C.2929.14(E)(4) or the prior R.C. 2929.14(E)(3).
[8] Neither party argues that R.C. 2929.14(E)(4)(a) or (c) are relevant here.
[9] Crim.R. 16(D) states in part:
 If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter * * *.
[10] Appellant is represented by different counsel in this appeal.